Lesley Lee GOSCH, Appellant,

v.

The STATE of Texas, Appellee.

No. 69,726.

Court of Criminal Appeals of Texas, En Banc.

Dec. 18, 1991.

Rehearing Denied Feb. 26, 1992.

---

Will Gray, Houston, for appellant.

Fred G. Rodriguez, Dist. Atty., and Sam Ponder, Charles Strauss and Edward F. Shaughnessy, III, Asst. Dist. Attys., San Antonio, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

McCORMICK, Presiding Judge.

A jury found appellant, Lesley Lee Gosch, guilty of capital murder, and answered penalty issues one and two in the affirmative. The death penalty was assessed as punishment. Now before this Court appellant raises five points of error. We will affirm the conviction.

We begin by addressing appellant's claim that the evidence is insufficient to corroborate an accomplice's testimony. Appellant was indicted for the offense of capital murder; in pertinent part the indictment reads as follows:

"[O]n or about the 18th day of September, A.D., 1985, LESLEY LEE GOSCH, hereinafter called defendant, did then and there intentionally cause the death of an individual, namely: REBECCA SMITH PATTON, hereinafter called complainant, by shooting the said complainant with a handgun and the said defendant did then and there intentionally cause the death of the said complainant while in the course of committing and attempting to commit the offense of KIDNAPPING upon REBECCA SMITH PATTON"

State's witness, John Lawrence Rogers, had also been indicted for the capital murder of Rebecca Patton. The State's case

against Rogers was pending at the time of trial. Appellant specifically asserts that the record is devoid of any evidence to corroborate the testimony of Rogers. We disagree.

■ Article 38.14, V.A.C.C.P., provides that "[a] conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense." [1] The test for deciding whether there is sufficient corroboration "is to eliminate from consideration the evidence of the accomplice witness and then to examine the evidence of the other witnesses with the view to ascertain if there be inculpatory evidence, that is evidence of incriminating character which tends to connect the defendant with the commission of the offense." *Edwards v. State,* 427 S.W.2d 629 (Tex.Cr. App.1968). See also *Reed v. State,* 744 S.W.2d 112, 125 (Tex.Cr.App.1988). The corroborative testimony need not directly link the accused to the crime or be sufficient in itself to establish guilt. *Richardson v. State,* 700 S.W.2d 591, 594 (Tex.Cr. App.1985); *Castaneda v. State,* 682 S.W.2d 535, 537 (Tex.Cr.App.1984).

■ All facts, both direct and circumstantial, may be examined in ascertaining whether sufficient corroboration exists. *Reed,* 744 S.W.2d at 126. If the combined cumulative weight of the other incriminating evidence tends to connect the accused with the commission of the offense, then the mandate of Article 38.14 has been fulfilled. See *Jackson v. State,* 745 S.W.2d 4, 13 (Tex.Cr.App.), cert. denied, 487 U.S. 1241, 108 S.Ct. 2916, 101 L.Ed.2d 947 (1988); *Reed,* 744 S.W.2d at 125; *Mitchell v. State,* 650 S.W.2d 801, 807 (Tex.Cr.App. 1983), cert. denied 464 U.S. 1073, 104 S.Ct. 985, 79 L.Ed.2d 221 (1984); *Pinson v. State,* 598 S.W.2d 299, 302 (Tex.Cr.App. 1980); *Edwards,* 427 S.W.2d at 632.[2] An analysis of the accomplice and non-accomplice testimony is necessary in the case before us to ascertain if there is anything of an incriminating character which tends to connect appellant to the murder of Rebecca Patton other than the testimony of John Rogers.

### Accomplice Testimony

The accomplice witness, Rogers, was a long-time acquaintance of appellant. At some point in 1984, Rogers lived with appellant and appellant's girlfriend, a woman named Georgina. In August of 1985, appellant told Rogers that he was concerned about going to federal prison on a weapons violation conviction. Appellant felt that it would not be "constructive" for him to be imprisoned for this offense and sought to have Rogers aid him in fleeing the country. The two originally planned to rob a bank but Rogers rejected this alternative as "too risky and too violent."

The two then discussed a second alternative—that being kidnapping and ransoming the wife of a bank president. Appellant informed Rogers that he knew of two potential targets in the Alamo Heights area of San Antonio and, in the latter part of August of 1985, appellant began to focus on a specific target for his extortion scheme. In the latter part of August or early September of 1985, appellant first mentioned the name of Frank Patton as a potential target for the extortion plan.

Approximately two weeks later, Rogers and appellant began to formalize their scheme. They drove by the Patton home in early September to ascertain whether the plan could be completed safely. In mid-September appellant and Rogers began to take steps to carry out their plans. They planned that appellant was to gain access to the Patton home under the guise of delivering flowers to Rebecca Patton. After entering the home, appellant was to

1. Included in the trial court's instructions was a paragraph informing the jury that John Rogers was an accomplice and his testimony alone was insufficient to convict appellant of the offense.

2. There is no longer a requirement that the accomplice witness' testimony be corroborated as to the specific element that makes the murder in question a capital murder. *Holladay v. State,* 709 S.W.2d 194, 196–199 (Tex.Cr.App. 1986).

bind his victim with duct tape and then take her to a secluded, rural area of Bexar County. Rogers' role was to go to North Star Mall and wait for Frank Patton to arrive with a ransom payment. Originally, this scheme was to begin on September 16, 1985.

On September 15, 1985, appellant and Rogers made a dry run by the Patton residence. On September 16, at approximately 8:30 a.m., Rogers picked up appellant at the Windsor Park Mall's "Park and Ride." The two then drove to a Stop and Go convenience store located in the 500 block of Austin Highway near Alamo Heights. There Rogers purchased a soft drink along with a pastry and appellant bought a carton of milk. After leaving the store, Rogers and appellant drove around the Pattons' neighborhood to determine whether there was much activity on the streets and whether Rebecca Patton's automobile was parked at the home.

While driving around the neighborhood, Rogers began having second thoughts. Rogers felt that they should carry out their plan another day because of problems with his car. Appellant was angered by Rogers' position; nevertheless, he agreed to cancel plans for that day. The two agreed to try again the next day, September 17, 1985. Rogers and appellant then left Alamo Heights.

On the 17th of September, Rogers again rendezvoused with appellant at the Park and Ride. The pair once again drove to the same Stop and Go convenience store on Austin Highway. Once again Rogers' lack of courage and his misgivings about his automobile caused the operation to be postponed. The two agreed to try the next day.

On September 18th, Rogers once again met appellant at the Park and Ride. They once again visited the Stop and Go convenience store on Austin Highway. Rogers and appellant then returned to the Pattons' neighborhood. After satisfying themselves that Mrs. Patton was at home, the two drove to Rogers' apartment so that appellant could change his shirt. At Rogers' apartment, appellant changed out of a cam-

ouflage shirt and into a blue one belonging to Rogers' one-time roommate, Stephen Hurst. Rogers made a phone call (at approximately 10:30 a.m.) to the Patton residence to determine if Mrs. Patton was home alone. Rogers also called the bank where Mr. Patton worked. Rogers was informed that Mr. Patton was in a meeting; Rogers stated that he would call back. After calling the bank, Rogers and appellant returned to Alamo Heights.

Rogers drove appellant to the Pattons' neighborhood and dropped him off in the vicinity of the Patton home. Appellant left the car with a flower box containing a .22 caliber pistol, a black silencer and a roll of duct tape. Rogers then drove around the block twice; on the second trip around the block, Rogers saw appellant walking toward the bus stop. At this point Rogers picked up appellant. Appellant informed Rogers that no one had answered the door at the Patton home. The two drove around looking for a pay telephone. After finding one, appellant called the Patton home and spoke with Rebecca Patton. He told her that he was from a nursery and that he had sent a man to the house who was unable to deliver some flowers. Mrs. Patton apologized saying she had been unable to hear the door because she had been vacuuming.

At some point between 1:00 p.m. and 2:00 p.m., Rogers again called the Castle Hills bank and asked to speak with Frank Patton. Rogers used the fictitious name of Mr. Anderson in this second call and hung up as soon as Frank Patton answered the phone. After making his call to the bank, Rogers drove appellant back to the Pattons' neighborhood and once again dropped him off in the vicinity of their home. Rogers then drove to a liquor store with a pay telephone and waited for appellant to call.

Rogers stood by the phone for approximately twenty minutes awaiting appellant's call. The call never came; instead, appellant came running back to the phone booth. Upon seeing Rogers, appellant stated, "There was no need to go get the money because [I] killed her."

When appellant got into the car, he removed the .22 caliber pistol, silencer and

duct tape from the waistband of his blue jeans. The two drove back to appellant's apartment. At that time, appellant gave Rogers a black bag containing the Ruger automatic, two silencers, another handgun and some ammunition. Appellant also gave Rogers a bag containing appellant's shirt and shoes. Rogers placed all these items in the trunk of his car and returned to his apartment. With the exception of the shoes, Rogers took these items, along with a pair of gloves belonging to appellant, to his apartment. Rogers examined the murder weapon at the apartment and determined that it was no longer loaded. Rogers put the two pistols, the two silencers and the ammunition into a brown attache case and gave it to Stephen Hurst that evening. Rogers asked Hurst to take the weapons and put them up out of the way, or, as he phrased it, "put them in the deep freeze."

On the day after the murder, Rogers picked up appellant at the Wonderland Mall and they returned to Rogers' apartment. Appellant lived at Rogers' apartment until the two were arrested on September 25, 1985.

*Non-accomplice Testimony*

At approximately 11:00 a.m. on September 18, Sherry Satel, Rebecca Patton's friend, was talking with her over the phone. At some point in their conversation, Rebecca told Sherry that she had another call. She put Sherry on hold and came back on the line a "few seconds" later. Mrs. Patton told Mrs. Satel that someone had called to tell her they would be coming to her home to deliver some flowers. Mrs. Patton was puzzled about who might be sending her flowers. This phone conversation continued until approximately 12:30 p.m.

Sherry Covarrubias related that in September of 1985 she was employed by Stop and Go convenience stores in San Antonio. She was assigned to work the Stop and Go at 506 Austin Highway in Alamo Heights. According to Covarrubias, on September 18 appellant came into her store with a "heavy set" man who was taller than appellant (this individual was later identified as appellant's accomplice John Rogers). Covarrubias stated she recalled appellant because she had a conversation with him regarding the thick lenses on his glasses, and because he had been in the store a couple of times in the week prior to September 18th.

On September 18th, at approximately 2:25 p.m., Mrs. Patton called her husband on his private line at the bank. According to Frank Patton's secretary from the Castle Hills National Bank, Jo Ann Galindo, Mrs. Patton seemed to be in a strange frame of mind. Galindo felt that Mrs. Patton was acting unusually abrupt and unfriendly over the phone. Mrs. Patton told Galindo that she needed to speak to Frank; the secretary put the call on hold and informed Frank Patton that his wife was on the telephone. Moments later, Frank Patton waved Galindo into his office and began to write a note for her trying to explain that there was an extortion threat. Galindo left the office immediately and called the FBI. Another cashier began getting the ransom money together. According to Galindo, at approximately 12:30 that same day, an individual by the name of Mr. Anderson had called and asked to speak with Frank Patton.

Frank Patton testified that he was the president of the Castle Hills National Bank in San Antonio. He had been married to Rebecca for seventeen years. On the morning of September 18th, Frank and his wife jogged around the neighborhood before he left for the bank. Shortly after lunch, his wife called the bank; Mr. Patton's secretary answered. When he took the call, his wife told him "there is someone here that has to talk to you." At that point, a male voice came over the phone and informed Mr. Patton that, "I want you to get some money together in a briefcase." The caller told Mr. Patton he wanted it in "fifties" and "hundreds." The caller also informed Mr. Patton that the money was to be taken to the picnic area of North Star Mall. While listening to the call, Mr. Patton called the secretary into his office and began to write "extortion threat" on a piece of paper for her to see.

Mr. Patton asked how much money the caller wanted. The caller told him to bring "as much as you can get in a brief case." Before hanging up, the caller informed Mr. Patton that he had "forty-five minutes to get the money there, or it will all be over."

Shortly after the extortion call, members of the Castle Hills police department arrived at the bank and informed Mr. Patton that his wife was dead. In an attempt to catch the murderer, Mr. Patton went to the picnic area of North Star Mall and stood by the pay phone for an hour. No one came.

According to Mr. Patton's testimony, he met appellant at Chris Catham's sailboat shop in San Antonio in June of 1985. At that time he informed appellant that he was a bank president in San Antonio. He gave appellant a business card.

Officer Dornak of the Alamo Heights police department was one of a number of law enforcement officers who were dispatched to the Patton home on the afternoon of September 18th. According to Officer Dornak, the rear door of the Patton home was locked with a dead-bolt. There were no signs of a disturbance.

Officer David Anderson, an investigator with the San Antonio police department, testified that he was also dispatched to the Patton home to collect and preserve any available evidence. Officer Anderson obtained seven spent shell casings found near the body. Another investigator with the San Antonio police department, Officer David DeLuna, testified that he recovered three bullet fragments also near Mrs. Patton's body. Officer Giles Fortson Alamo Heights police department testified that he was the first law enforcement officer to gain entry to the Patton home. When he arrived, Mrs. Patton's body was still "warm to the touch."

Dr. Vincent DeMaio, Chief Medical Examiner of Bexar County, testified that Rebecca Patton had been shot six times in the head. DeMaio recovered the bullet fragments from the skull of the deceased and turned them over to a firearms examiner. According to DeMaio, Rebecca Patton died as a result of multiple gunshot wounds to her head.

Roger Terry, police chief for the city of Alamo Heights, related that on September 25th an individual named Stephen Hurst gave him a brown briefcase. In the briefcase there were two silencers, a .22 caliber Ruger semi-automatic pistol and three boxes of Eley ammunition. Terry took the silencers and the .22 caliber pistol to the Bexar County medical examiner's office for the purpose of having ballistic tests run on those items. After obtaining these items, the police procured a search warrant for the apartment of John Rogers. Appellant was arrested during the execution of this warrant.

Texas Ranger Bob Steele also assisted in the search of Rogers' apartment. According to Steele, during the execution of the search warrant police officers found appellant in the apartment and promptly arrested him. Rogers had left the apartment prior to the execution of the warrant and was arrested approximately one mile from the residence. During the search, officers found a number of books and newspapers—one of the books told how a person could change his or her identity and the newspapers contained articles about the Patton murder. Officers also found a crumpled, handwritten note containing the following notation:

"Long–Term Strategic Goals: 1. New I.D. w/ complete history 2. $100 K to $200 K U.S. Cash 3. Closed File on Old I.D."

Allen Southmayd, a forensic document examiner from the Bexar County Regional Crime Laboratory, testified that he made a handwriting comparison between a job application filled out by appellant, a "bill of sale" also filled out by appellant and the "Things To Do" note found in the Glendale apartment. Southmayd concluded that appellant wrote the "Things To Do" note.

Officers also recovered a pair of blood splattered blue jeans from the apartment; and, in Rogers' automobile, they found a pair of black gloves, a map of Belize and a story on the nation of Belize along with a birth certificate belonging to Chris Catham.

Jayne Nellis, a forensic serologist with the Bexar County Regional Crime Laboratory, testified that appellant had type "O" blood, while Rebecca Patton had type "A" blood. Nellis also conducted a test on the blood found on the blue jeans seized at the Glendale apartment; this test revealed that the jeans were smeared with type A human blood.

Richard Stengel, a firearms examiner with the Bexar County Regional Crime Laboratory, testified that he performed forensic tests on the Ruger .22 caliber semiautomatic pistol, the two silencers, the bullet fragments that Dr. DeMaio had removed from the skull of the deceased, and the spent shell casings found next to the body. According to Stengel, the ammunition used in the murder was Eley ammunition. Stengel was also able to determine, through test firing of the weapon, that the Ruger .22 caliber pistol was the murder weapon used to cause the death of Rebecca Patton.

Special Agent Larry Swisher of the United States Treasury Department's Bureau of Alcohol, Tobacco and Firearms testified that, according to the Bureau's firearms transaction records, the murder weapon (Ruger pistol, Mark II, .22 caliber, serial number 21097013) was purchased at Don's Gun Sales in San Antonio. The State introduced a document showing that the pistol was purchased in the name of Randall Wroblewski.

Randall Wroblewski testified that he had been appellant's friend for approximately ten years. Wroblewski related that he had a conversation with appellant concerning appellant's up coming sentencing hearing in federal court. According to Wroblewski, appellant stated, "[i]f I walk in, I'm not walking out, so I'm not going to show up." Appellant also told Wroblewski that if the FBI ever inquired about him (appellant), Wroblewski was not to mention appellant's association with Rogers. Wroblewski also testified that when he purchased the Ruger .22 caliber pistol at Don's Gun Sales he was purchasing it for appellant. Wroblewski related that he paid for the pistol but he immediately gave it to appellant who kept

it thereafter. Wroblewski identified State's Exhibit Number 52 as the pistol which he purchased at appellant's request.

The owners of Don's Gun Sales, Don and Leslie Carter, testified that on Labor Day of 1985 appellant visited their home for the holiday weekend. At that time appellant informed Leslie that he owned a .22 caliber Ruger pistol.

One of Rogers' acquaintances, Stephen Hurst, testified that during the late summer and early fall of 1985, he was living with Rogers at Rogers' apartment in San Antonio. According to Hurst, on September 18th, at approximately 5:00 p.m., Rogers gave him a brown briefcase containing three pistols and two silencers. Included among the pistols was a .22 caliber Ruger (identified at trial as the murder weapon). Later that same day, Hurst took the briefcase, containing the weapons and silencers, to the home of John Howells. Howells returned the briefcase with the .22 Ruger to Hurst on September 25th, after which Hurst turned the briefcase and its contents over to the Alamo Heights police department.

John David Howells, a friend of Stephen Hurst and John Rogers, testified that on the day Rebecca Patton was murdered Hurst came to his home. Hurst brought with him the brown briefcase. The briefcase was locked with a combination lock. Howells did not know the combination. Howells kept the briefcase until the following Monday, at which time John Rogers took it for "two or three" hours. Later that Monday, Howells retrieved the briefcase from Rogers and kept it until the following Wednesday. On that day, Howells returned the briefcase to Stephen Hurst. According to Howells, on the morning before Hurst came to get the briefcase, Hurst had given him the combination to the lock on the briefcase. When Howells opened it, he found that it contained two silencers, a .22 caliber pistol, a couple of boxes of shells and some small rubber disks.

Chris Catham, the owner of Sweetwater Sailcraft, testified that he had known appellant for approximately four years. Ap-

pellant worked on a contract basis with Catham until April of 1985 at which time Catham hired appellant to work for an hourly wage. At the time he was hired as a full time employee, appellant filled out and signed an employment application. One of appellant's duties at Sweetwater Sailcraft was to answer the telephone and make a log of incoming phone calls. That telephone log contained an entry from July 12, 1985, which read, "Frank Patton needs to pick up trailer." Catham also identified a birth certificate that he had kept in his sailboat shop office. Catham testified that appellant had free access to the office where the birth certificate was kept. (As mentioned above, the police found Chris Catham's birth certificate in Rogers' automobile on September 30, 1985.)

Jorge Valdez was one of appellant's co-workers from the sailboat shop. While working there, appellant introduced Valdez to Frank Patton. At that time, appellant informed Valdez that Patton was the president of a bank. Henry Holly testified that he had also worked with appellant at the Sweetwater Sailcraft Shop in San Antonio. In early September of 1985, appellant told Holly that he was concerned about his upcoming sentencing in a San Antonio federal court. Two days after the murder, on September 20, 1985, appellant asked Holly if he could help him get to Belize by giving him a ride to McAllen.

The defense offered no testimony and closed immediately after the State.

Our examination of the non-accomplice witness testimony reveals the following facts which we conclude sufficiently "tend to connect" appellant to the murder of Rebecca Smith Patton: (1) appellant knew the identity and occupation of the target of the attempted extortion plan, Frank Patton; (2) appellant was seen in the vicinity of the offense in the company of the accomplice on the day of the crime; (3) appellant owned the murder weapon; (4) appellant was arrested at a location where police found clothes splattered with the same blood type as that of the deceased; (5) appellant wrote a note stating he needed "$100 K to $200 K U.S. Cash" and had a motive for obtaining that large amount of money in a hurry; (6) appellant solicited the aid of a friend in an attempt to flee the country two days after the offense. There is ample evidence to corroborate the testimony of John Rogers by tending to connect appellant with the murder of Rebecca Patton. Appellant's fourth point of error is overruled.

■ In his first point of error appellant contends that the trial court erred in admitting evidence of extraneous acts of misconduct at the guilt-innocence phase of trial. Specifically, appellant complains that the trial court erred in allowing John Rogers to testify to an extraneous offense regarding appellant's federal firearms violation conviction.

According to Rogers' testimony, appellant was afraid of having to do some "federal time" for the offense of the illegal transfer of a silencer. Appellant felt that it would not be "constructive" for him to be incarcerated in a federal prison and he therefore sought an alternative to appearing in federal court on September 20, 1985, for his sentencing hearing. As discussed above, Rogers testified that the two of them concocted a scheme to extort a large amount of cash from a bank president in order to finance appellant's flight to Belize.[3]

3. This plan to extort money was corroborated by two other witnesses, Henry Holly and Randall Wroblewski. Specifically, Henry Holly testified as follows:

"Q. [By State's Attorney]: Do you—you ever remember having a conversation with Lesley Gosch regarding some problems he was having about a weapons violation?
"A. Yes, sir.
"Q. All right. Do you recall where this conversation took place?
"A. Jim's Coffee Shop.

"Q. And do you recall approximately when it took place, say in relationship to the murder of Becky Patton?
"A. I'm no good with dates, but it was a week or so before.
"Q. Okay. Sometime before Mrs. Patton was killed?
"A. Yes, sir.
"Q. What was the conversation about?
"A. Well, we started out talking about sailing, and then we got on to this arms violation

■ Appellant's desire to avoid being incarcerated in a federal prison for his weapons offense was the triggering factor of the chain of events which ultimately resulted in the murder of Rebecca Patton. Appellant's urgent need for thousands of dollars to finance his flight to Belize and thus avoid appearing in federal court was shown to be the motivation of the extortion plot. Evidence which demonstrates the presence of a motive on the part of the accused is admissible if it is relevant as a circumstance tending to prove the commission of the offense. See *Russell v. State*, 598 S.W.2d 238, 250 (Tex.Cr.App.1980), cert. denied 449 U.S. 1003, 101 S.Ct. 544, 66 L.Ed.2d 300 (1981).

■ If the evidence in question also happens to involve an extraneous act of misconduct on the part of the accused it is nevertheless admissible if the relevancy value of the testimony outweighs its potential for undue prejudice. See *Williams v. State*, 662 S.W.2d 344 (Tex.Cr.App.1983); *Russell*, 598 S.W.2d at 250–251; *Barefoot v. State*, 596 S.W.2d 875, 886–887 (Tex.Cr. App.1980), cert. denied 453 U.S. 913, 101 S.Ct. 3146, 69 L.Ed.2d 996 (1981). In the case at bar, the testimony of Rogers concerning appellant's impending sentencing and his need for cash to avoid imprisonment by fleeing the country clearly outweighs any undue prejudice arising from that testimony. The efforts of the accused to avoid future incarceration are clearly admissible to show a motive for committing a seemingly senseless murder. See *Valdez v. State*, 776 S.W.2d 162, 167 (Tex.Cr.App. 1989) (testimony that defendant was on federal parole and knew that he had outstanding warrant for violating this parole by carrying a firearm was admissible to show motive for shooting police officer); *Russell*, 598 S.W.2d at 251 (testimony that murder victim was a potential witness in a robbery prosecution against the accused held admissible); *Barefoot*, 596 S.W.2d at 886–887 (testimony that accused was an escapee from New Mexico where he was wanted for criminal sexual penetration of a minor held admissible in trial for murder of police officer who stopped accused for questioning); *Hughes v. State*, 563 S.W.2d 581, 588 (Tex.Cr.App.1978), cert. denied 440 U.S. 950, 99 S.Ct. 1432, 59 L.Ed.2d 640 (1979) (testimony that accused was placed on probation seven months prior to slaying of police officer held admissible in light of fact that accused was in possession of weapons and credit cards in another individual's name). Without the evidence, Rebecca Patton's death is an inexplicable, seemingly senseless murder by a stranger. We cannot say that the trial court abused its discretion in allowing the jury to hear the complained of evidence. Accordingly, appellant's first point of error is overruled.

In his second point of error, appellant contends that he was denied the effective assistance of counsel because his trial counsel made no objections when Wroblewski and Holly gave testimony relating to

that he had been busted on, and he was paranoid about going to the joint.
"Q. What did he say about that?
"A. Well, he was shook up and didn't want to go. But, you know, he didn't have much choice."
During the examination of Randall Wroblewski, the State elicited the following testimony:
"Q. [By State's Attorney]: Did you ever have a conversation with Lesley Gosch about his having to go to see the judge?
"A. He had a conversation that he mentioned he had to go see a judge concerning one of the weapons. Yes, sir, he did.
\* \* \* \* \* \*
I think he was relating to me that he was kind of scared of going to jail.
\* \* \* \* \* \*
"Q. He was going to drop out of sight or disappear?

"A. Just drop out of sight for a while until the F.B.I. cools their—gets their heat cooled off a little, until everything cools off and come out again."

his federal parole violation.[4] Appellant insists that counsel should have objected to such testimony. Related to this point of error, appellant contends in his third point of error that he was denied the effective assistance of counsel by the State's use of this extraneous offense testimony as the "sole" corroboration of the accomplice witness testimony. Once again we disagree with appellant's position.

In reviewing claims of ineffective assistance of counsel, the standard to be applied is whether an accused received "reasonably effective" assistance. *Brewer v. State*, 649 S.W.2d 628, 630 (Tex.Cr.App.1976). The Supreme Court formulated a standard of review for an appellate court to utilize in making its decision regarding whether counsel has rendered effective assistance of counsel to his client in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).[5] Under *Strickland* a two-pronged test is utilized. First, appellant must demonstrate that counsel's representation was deficient and not reasonably effective. Second, appellant must show that the deficient performance prejudiced the defense. This two-pronged test is the "benchmark for judging ... whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686, 104 S.Ct. at 2064. "The Sixth Amendment ... envisions counsel's playing a role that is critical to the ability of the adversarial system to produce just results." 466 U.S. at 685, 104 S.Ct. at 2064. Thus, in determining whether trial counsel's performance was deficient (the first of the two prongs), the reviewing court must ascertain whether counsel's errors were so serious that counsel was not functioning in a manner envisioned by the Sixth Amendment. See *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064. See also *Burger v. Kemp*, 483 U.S. 776, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987); *Kimmelman v. Morrison*, 477 U.S. 365, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986).

Because we find that the trial court did not abuse its discretion in allowing the jury to hear testimony concerning the extraneous offense (see point of error number one), we find that counsel was not ineffective for his failure to object at times where the same or similar testimony was presented to the jury. That is, we find that there is *no* deficiency in counsel's failure to convince the trial court in the first instance to exclude relevant testimony regarding appellant's motive and thus subsequently failed to object when the same or similar testimony was brought forward. See *Holland v. State*, 761 S.W.2d 307, 318–319 (Tex.Cr.App.1988) (holding that "counsel was under no obligation to do what would amount to a futile act"); *Bridge*, 726 S.W.2d at 566 (because trial court did not err in excusing prospective juror, counsel cannot be faulted for failing to object). Consequently, such testimony could be used to corroborate the accomplice witness' testimony (see point of error number four). Appellant's second and third points of error are without merit and are overruled.

In his fifth point of error, appellant contends that the Texas capital murder sentencing scheme is unconstitutional because it contains no provisions for directing and instructing the jury's consideration of mitigating circumstances at the penalty stage of the trial. Specifically, appellant asks this Court to undertake a "new, detailed re-examination" of the Texas capital sentencing scheme; he submits that the special issues, as currently submitted, are insufficient to allow the jury to give adequate consideration to mitigating evidence which may have been presented during either the guilt-innocence or punishment phase of trial. Although appellant failed to advance his constitutional claims in the trial court we will examine his complaint in light of *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989).

In *Penry* the Supreme Court determined that the Texas death penalty statute was

4. Portions of Holly's and Wroblewski's testimony are set out in footnote number 3.

5. This Court adopted the *Strickland* standard in *Bridge v. State*, 726 S.W.2d 558, 571 (Tex.Cr.App. 1986) and *Hernandez v. State*, 726 S.W.2d 53, 56 (Tex.Cr.App.1986).

unconstitutional as applied because the statutory jury instructions, Article 37.071, V.A.C.C.P.[6], provided no vehicle for the jury to express its "reasoned moral response" and thus give mitigating effect to Penry's evidence of mental retardation and childhood abuse. The Court reasoned that to meet constitutional muster, the sentencing authority in a capital case must be allowed to consider all relevant mitigating evidence. *Penry*, 492 U.S. at 317, 109 S.Ct. at 2946. See also *Franklin v. Lynaugh*, 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988) (plurality opinion); *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (plurality opinion); *Green v. Georgia*, 442 U.S. 95, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979); *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982).

Prior to *Penry*, the Supreme Court, in examining Article 37.071 in regards to a juror's consideration of mitigating evidence, explicitly held that "the Texas capital-sentencing procedure guides and focuses the jury's objective consideration of the particularized circumstances of the individual offense and the individual offender before it can impose a death sentence." *Jurek v. Texas*, 428 U.S. 262, 274, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976). In *Penry*, however, the Court gave special signifi-

cance to the phrase "reasoned moral response." The Court concluded that, in the absence of instructions informing the jury that it could consider and give effect to the mitigating evidence of Penry's mental retardation and abused background, "the jury was not provided with a vehicle for expressing its 'reasoned moral response' to that evidence in rendering its decision." 492 U.S. at 328, 109 S.Ct. at 2952.[7] Thus, in those particular cases where evidence is presented that 1) is mitigating in nature, 2) is relevant to a juror's determination that death would or would not be the appropriate "reasoned moral response" to the defendant's particular circumstances, *and* 3) the mitigating effect of the evidence cannot be considered under the statutory special issues, the trial court judge is required to submit to the jury "instructions informing the jury that it could consider and give effect to the [particular] mitigating evidence ... by declining to impose the death penalty." *Penry*, 492 U.S. at 328, 109 S.Ct. at 2952.

Appellant has failed to direct our attention to where in the record there exists mitigating evidence that would give rise to *"Penry"* special instructions. Nevertheless, from our reading of the record we find that the only evidence offered at trial,

---

6. Under our capital sentencing procedure a jury, after finding the evidence sufficient to establish guilt, is required to answer three special issues:

"(1) Whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;

"(2) whether there is a reasonable probability that the defendant would commit criminal acts of violence that would constitute a threat to society; and

"(3) if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased." Article 37.071, V.A.C.C.P.

If the jury answers all questions "yes," the court must impose a death sentence. If the jury answers any of the questions "no," or fails to answer any question, the court must sentence the defendant to life imprisonment.

7. The phrase can be traced to *Brown v. California, 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987), where Justice O'Connor wrote:

"In my view, evidence about the defendant's background and character is relevant because of the belief held by this society that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse. This emphasis on culpability in sentencing decisions has long been reflected in Anglo–American jurisprudence. As this Court observed in *Eddings*, the common law has struggled with the problem of developing a capital punishment system that is 'sensible to the uniqueness of the individual.' 455 U.S. at 110, 102 S.Ct. at 874. *Lockett* and *Eddings* reflect the belief that punishment should be directly related to the personal culpability of the criminal defendant. *Thus, the sentence imposed at the penalty stage should reflect a reasoned moral response to the defendant's character, background, and crime rather than mere sympathy or emotion.*" 479 U.S. at 545, 107 S.Ct. at 841 (O'Connor, J., concurring) (emphasis added).

even arguably mitigating in nature, was presented to the jury in the context of the second special issue and could be considered by the jury in deciding its response to that issue.

Appellant presented only two witnesses in the punishment phase of trial—a close acquaintance and his adoptive father.[8] The acquaintance testified that appellant was an "easy going nonviolent type person," and he did not consider it to be unusual that appellant had an interest in explosives and weaponry. Appellant's father related that he adopted appellant after appellant's mother (the wife of his step child) had abandoned him before the age of six months.[9] The father also testified that appellant was "very active" in school activities and that appellant had "diplomas hanging all over the wall in his room that he won from various organizations." He testified that appellant was adept in science and that he had a high IQ. Appellant was an Eagle Scout. The father also testified that appellant was a gunsmith and that he enjoyed the "engraving and all this fine workmanship" involved with gun making. Appellant's father further testified that appellant used to experiment with explosives until he disfigured his hand and lost sight in one of his eyes in an accident that involved experimenting with nitroglycerin.

Certainly appellant's evidence is not of the same quality and character as that facing the Supreme Court in *Penry*. There the Court confronted evidence demonstrating that Penry suffered from organic brain damage and moderate mental retardation. He was shown to have had a gruesome upbringing where as a youth he was beaten

frequently resulting in a variety of learning and behavioral dysfunctions in his adult life. The Supreme Court determined that such mitigating evidence "ha[d] relevance to his moral culpability beyond the scope of the special issues and that the jury was unable to express its 'reasoned moral response' to that evidence in determining whether death was the appropriate punishment." 492 U.S. at 322, 109 S.Ct. at 2948. The evidence in this case, is unrelated to any aspect of how or why death in this case would or would not be an appropriate response to appellant's actions. That is, because the evidence in the case before us is dissimilar to that found in the *Penry*, we conclude that appellant's claim that the Texas death penalty statute is unconstitutional is without merit in this case where the jury could give mitigating effect to any mitigating evidence through the special issues that were submitted. See *Trevino v. State*, 815 S.W.2d 592 (Tex.Cr.App.1991); *Russell v. Lynaugh*, 892 F.2d 1205, 1214–1215 (5th Cir.1989); *McCoy v. Lynaugh*, 874 F.2d 954, 966 (5th Cir.1989). See also *Franklin v. Lynaugh*, 487 U.S. at 177, 108 S.Ct. at 2328. Accord *Stewart v. State*, 686 S.W.2d 118, 121 (Tex.Cr.App.1984), cert. denied 474 U.S. 866, 106 S.Ct. 190, 88 L.Ed.2d 159 (1985) (this Court holding that the questions prescribed under Article 37.-071 allowed the jury to grasp the logical relevance of mitigating evidence, and as such there was no need to further charge the jury regarding evidence of mitigating circumstances); *Quinones v. State*, 592 S.W.2d 933 (Tex.Cr.App.), cert. denied 449 U.S. 893, 101 S.Ct. 256, 66 L.Ed.2d 121 (1980) (same).[10]

---

8. We note here that all of the evidence presented by the State was aggravating in nature. The State's witnesses testified as to appellant's bad reputation in the community, his experimenting with explosives, his prior offenses (robberies and firearms violations), and his unfavorable conduct while being incarcerated on the capital murder charges. We have searched the entire statement of facts—both the statement from the punishment phase and the guilt/innocence phase—to find evidence that would have given rise to special instructions. We were not able to find any such evidence in the guilt/innocence phase of trial.

9. The father started to testify that his wife, who had attended the mother after she gave birth to appellant, told him that the child had been mistreated. The State objected that such testimony was hearsay. The trial court sustained the objection and the defense did not further develop this type evidence.

10. Our conclusion is buttressed by *Penry's* implicit affirmation of the facial constitutionality of the Texas death penalty laws. 492 U.S. at 318, 109 S.Ct. at 2946–2947 (Supreme Court noting that "the facial validity of the Texas death penalty statute had been upheld in *Jurek*

Appellant also attacks the constitutionality of the death penalty statute on the additional ground that it fails to narrow properly the class of persons eligible for the death penalty. This issue has been decided adversely to appellant in *Jurek v. State*, 522 S.W.2d 934, 938–939 (Tex.Cr.App.1975), *affirmed by, Jurek v. Texas*, 428 U.S. 262, 268, 96 S.Ct. 2950, 2954–55, 49 L.Ed.2d 929 (1976). We are not persuaded by appellant's argument to re-review that decision.

Accordingly, appellant's last point of error is overruled and the conviction is affirmed.

BAIRD, J., concurs in the result.

CLINTON, J., dissents for reasons given in his dissenting opinion in *Ex Parte Bower*, 823 S.W.2d 284 (Tex.Cr.App.1991).

on the basis of assurances that the special issues would be interpreted broadly enough ... [and that] Penry argues that those assurances were not fulfilled *in his particular case* ..." [emphasis in the original] ). See also *Blystone v. Pennsylvania*, 494 U.S. 299, 110 S.Ct. 1078, 1081, 108 L.Ed.2d 255 (1990) (Supreme Court noting constitutionality of Texas death penalty after *Penry*

decision). If we were to hold that the slightest bit of good character testimony, not shown to be relevant to the offense or the offender warranted a special instruction in every case, we would have serious doubts as to the statute's constitutionality. See *Furman v. Georgia*, 408 U.S. 238, 309–310, 92 S.Ct. 2726, 2762–63, 33 L.Ed.2d 346 (1972) (Stewart, J., concurring).