COURT OF APPEALS

















COURT
OF APPEALS

EIGHTH
DISTRICT OF TEXAS

EL PASO, TEXAS

 

KEMORIA SMITH,                                             )

                                                                              )              
No.  08-03-00198-CR

Appellant,                          )

                                                                              )                    Appeal from the

v.                                                                           )

                                                                              )                
120th District Court

THE STATE OF TEXAS,                                     )

                                                                              )            
of El Paso County, Texas

Appellee.                           )

                                                                              )                      (TC# 71991)

                                                                              )

 

 

OPINION  ON 
REMAND

 








Appellant Kemoria
Smith appeals his conviction for aggravated robbery with an affirmative deadly
weapon finding.  Appellant was charged by
indictment with two counts of aggravated robbery.  Over Appellant=s
not guilty plea, the jury found Appellant guilty of the Count I offense.  The trial court assessed punishment at 26
years=
confinement.  On April 21, 2005, this
Court affirmed Appellant=s
conviction.  Smith v. State, No.
08‑03‑00198‑CR, 2005 WL 957926 (Tex.App.‑-El Paso Apr.
21, 2005, pet. granted)(not designated for publication). Appellant filed a
petition for discretionary review, which was granted by the Court of Criminal
Appeals.  On February 8, 2006, the Court
of Criminal Appeals vacated our prior decision and remanded the case to this
Court for consideration of Appellant=s
second issue, in which he claims the evidence is factually insufficient to
establish his identification as a participant, in addition to his first issue
on the sufficiency of the evidence to sustain his conviction based on
accomplice testimony.  See Smith v.
State, No. PD‑761‑05, 2006 WL 287994 (Tex.Crim.App. Feb. 8,
2006) (not designated for publication). 
On remand, we affirm the trial court=s
judgment.

In our prior
opinion, this Court summarized the facts as follows:

On September 30,
1993, store clerk Albert Hanson was working the late night shift at the Circle
K on Zaragosa in El Paso, Texas. 
Around 5:30 a.m., Mr. Hanson was standing behind the counter when three
men entered the store in single file. 
The first to enter was a black male wearing a hood, a baseball cap, and
dark clothes.  The second was a short
Hispanic male with scars on his face, and the third was a tall, slender
Hispanic male.  The men were quiet as
they filed in sideways to Mr. Hanson, but then they all turned simultaneously
towards him and started screaming at him. 
The man in the middle pulled out a black revolver.  The men shouted, AThis
is a robbery.  Give us your money.  We are not kidding.@  Mr. Hanson was scared and focused his
attention on the Hispanic male in the middle who had the gun pointed at his
face.  Mr. Hanson kept thinking that the
gun could go off by accident and was having difficulty remembering how to open
the register with no sale because he was so shaken up.  The men became upset and continued yelling at
Mr. Hanson.  Mr. Hanson eventually
remembered how to open the register and handed the whole cash drawer to the man
in the middle, who then handed it to the black man on the side.  The cash drawer contained United States
currency and change.








The man in the
middle leaned over the counter, looked at the drop safe, and asked a question
about it.  Mr. Hanson could not remember
what he said in response.  The man in the
middle then took a step back, pointed the gun at Mr. Hanson, and said, ANow you are going to die.@ 
Mr. Hanson remembered turning to his right and putting his hands in
front of his face.  After that, his
memory of the event was fuzzy.  He
remembered seeing the flash of the gun and thinking that it did not come from
the direction from which he thought it would come.  Mr. Hanson had doubts as to whether the
shot came from the man in the middle and suspected that the shot came from
where the black man had been standing, but he had not seen the black man
holding a gun.  Mr. Hanson was shot in
the face and his left hand.  He managed
to make his way to the back of the store and the store manager called for
emergency help.

Officer Gilbert
Cedillo was dispatched to the Circle K store at approximately 6 a.m.  When he arrived, he found the store clerk
sitting in a chair with gunshot wounds to his face and hand, both of which were
bleeding profusely.  The clerk was
delirious, in pain, and screaming.  Mr.
Hanson described the suspects as three men, one was black and two were
Hispanic.  He also described the men as
cholo types with baggy clothes.  Officer
Cedillo=s partner
put out a spot broadcast with information about the possible suspects.  After being transported to the hospital, the
clerk told Officer Cedillo that the suspects were two white males and one black
male and that he believed it was the short white male who fired the gun because
he was the last person he saw holding the gun.








Officer Victor
Rosales was patrolling the general area when the dispatch call on the shooting
at the Circle K store was issued.  Officer Rosales responded to the call, but
another unit arrived before him and put out a spot broadcast, describing the
suspects as two Hispanic or white males and one black male wearing dark
clothing.  Officer Rosales began
patrolling the residential area to the south of the Circle K store, which was
the direction in which the suspects were seen running.  About ten to fifteen minutes after the spot
broadcast, Officer Rosales and his partner were driving slowly through the
residential area when they saw a black teenager walking toward their patrol car
on Peter Hurd Street
,
which is approximately four or five blocks or one‑quarter mile from the
Circle K store.  Officer Rosales
identified Appellant as the man he encountered. 
Officer Rosales noticed that Appellant was walking toward Vista Del Sol
and that he kept looking back several times as if he was looking for
somebody.  When Appellant saw the patrol
car, he appeared stunned, hesitated, and then continued walking.  Officer Rosales exited the vehicle and approached
Appellant.  At first, Appellant hesitated
and then continued.  Officer Rosales
observed that Appellant was breathing heavily and was almost in a cold sweat.  Officer Rosales could not recall what
Appellant was wearing.

Officer Rosales
asked Appellant where he was coming from and Appellant stated that he was
coming from a friend=s
house in the residential area behind him. 
Appellant became irritable or irate. 
Because a gun had been used in the Circle K robbery and it was possible
that Appellant had been involved, Officer Rosales asked Appellant to get on the
ground, handcuffed him, and patted him down for weapons.  Officer Rosales found no weapons, but
Appellant remained in custody during the police investigation.








Officer Efran
Silva also responded to the dispatch regarding the shooting and began traveling
on foot in an easterly direction from the store in a desert area.  Officer Silva was looking for suspects when
he found United States
currency behind a home located at 11967 Manuel Acosta.  He also found shoe prints in the yard or area
where the money was found.  From there,
Officer Silva went back around to the address in the Peter Hurd area, which is
near a reservoir.  Once he got to the
Peter Hurd area, he found beer cans and other things near a paved drainage area
off of Cezanne, a semi‑circle road that leads to Vista Del Sol.  The paved drainage area was between houses
through the neighborhood and led down to the reservoir.  At the Cezanne address, Officer Silva found
shoe imprints that led to the reservoir. 
It was later determined that the shoe imprints matched those found at
the Manuel Acosta address.  In following
the shoe prints to the reservoir, Officer Silva found a black sweatshirt with a
hood and a cap in a ponding area. 
Officer Silva found more shoe prints at the reservoir area that matched
the shoe prints at the other two locations.

Crime Scene Unit
Officer Kenneth Bauer testified that the shoe prints at the Manuel Acosta and
Cezanne locations did indeed match and that there were at least two or three
pairs.  He also testified that officers
recovered a cash register drawer on Manuel Acosta in the street.  Officer Tom Monday, another member of the
Crime Scene Unit, was able to lift one latent print from the cash register
drawer, but it was not of evidentiary value.








Detective Jesus
Pantoja was assigned as case agent in the investigation of the crime.  He testified that the initial suspects were
Tomas Lopez, Michael Sheehan, and Appellant.[1]  Eric Condrin and Keith Ontiveros were later
included as suspects.  Detective Pantoja
showed five photo line‑ups, each containing one suspect to Mr. Hanson
several hours after the offense, while Mr. Hanson was still being treated in
the hospital.  Mr. Hanson looked at the
pictures just briefly, but could not make any sort of identification at the
time and recalled that Ait
was just all a big blur to [him].@  Warrants were secured for the arrest of
Appellant, Eric Condrin, and Keith Ontiveros. 
Appellant was immediately served since he was already detained, and the
arrest warrants for Eric Condrin and Keith Ontiveros were executed at a
residence located at 1566 Cezanne later that day.  Lopez and Sheehan, both of whom had been
interviewed earlier in the morning on the date of the offense, were not
arrested.

On October 13,
1993, Mr. Hanson was shown the photo line‑ups again.  This time he was able to identify Ontiveros
and Condrin, but was not able to identify Appellant.  Mr. Hanson identified the gun as a Smith and
Wesson snub‑nose, .357 Magnum, stainless steel, which Detective Pantoja
testified was capable of causing death or serious bodily injury.  Mr. Hanson did not identify Ontiveros as the
shooter, but did identify him as having had a large, dark‑colored
revolver at the scene of the crime.








At trial, Tomas
Lopez testified that on the evening of September 29, 1993, to the early morning
of September 30, 1993, Lopez was with Ontiveros, Condrin, Sheehan, and
Appellant, along with a few other males and some girls at Ontiveros= house. 
Lopez stated that he had known Ontiveros for about a year, Condrin for
about two years, Appellant for about four or five years, and Sheehan for about
a year and a half.  Lopez admitted that
he had taken his father=s
chrome‑colored, loaded .356 revolver from his father=s bedroom and that he had the gun with
him at Ontiveros= house.[2]  All night, Appellant had been asking Lopez to
let him see the gun.  Around three or
four in the morning, Lopez gave Appellant the gun.  After he gave Appellant the gun, Ontiveros,
Condrin, and Appellant left for the Whataburger because Athey
had a free ticket for food.@  Lopez recalled that Appellant was wearing a
black‑hooded sweatshirt, a white hat, and tennis shoes.  Ontiveros was wearing a black sweater and
Condrin was wearing some cut‑off sweats and a baseball cap.  Lopez identified the black sweatshirt and
white cap found by police in the reservoir as items that looked like what
Appellant had been wearing that night.

Lopez fell asleep
for a while and was awakened by Ontiveros at dawn.  Ontiveros was shaking him and told him that
they had robbed a store and showed him the money.  Lopez noticed that Ontiveros was nervous and
shaking.  Condrin was quiet, thinking,
and shaking as well.  Appellant was not
there and Lopez did not know where he was. 
Neither Ontiveros nor Condrin had his father=s
gun and they told him that they had thrown it away.  Lopez decided to leave and walked with
Sheehan in the direction of the Lopez residence and through a reservoir.  As they were walking, they were picked up by
the police and taken to the Circle K store on Zaragosa.  They were later taken to the police station
and interviewed.

Area resident
Steven Richie testified that on September 30, 1993, he resided at 11967 Manuel
Acosta.  Shortly before 6 a.m. that
morning, he heard the south metal gate on the side of his house open and heard
individuals walk across the gravel toward the back of the lot.  Mr. Richie was not especially alarmed
because children in the neighborhood often used his yard as a short cut to the
Circle K.  Out of curiosity, Mr. Richie
looked out the window and saw two individuals scaling the wall at the back of
his house.  Mr. Richie watched the
individuals cross over to the hillside behind his property and then as they
began up the rise, he saw that there were three individuals crossing toward the
northeast in the direction of the Circle K. 
They paused at the top of the hillside close to a chain‑link
fence.  On the other side of the fence is
a large ponding area for run‑off water.








Mr. Richie stopped
watching the individuals, but from an open bathroom window he overheard a
conversation between two young adult males coming from the general direction
that he had seen the individuals stop. 
Mr. Richie overheard two voices, discussing use of a gun at the Circle
K.  Mr. Richie called emergency 911 and
informed the dispatcher about the conversation. 
Several minutes later, the dispatcher called Mr. Richie back and told
him that a robbery had just occurred. 
While he was on the phone with the dispatcher, Mr. Richie heard one or
more individuals run through his backyard on the north side of the
property.  Mr. Richie estimated that the
span of time between when he first saw individuals in his backyard and when he
heard the footsteps running through his backyard was about seven to eight
minutes.

Dalton David
Southern testified that he knew Ontiveros, Lopez, Condrin, and Appellant and
considered all of them acquaintances. 
Southern used to play football with Ontiveros when they were young.  Southern had come to know Lopez and Condrin
about eight or nine months ago.  Southern
had known Appellant as an acquaintance for about six or seven months.  Southern became reacquainted with Ontiveros
around the same time.  He started
spending time with all of them around the same time, but spent more time with
Appellant than he did with Ontiveros.








On September 30,
1993, Southern was in the county jail. 
While he was in jail, Appellant was placed in the same cell.  Southern was asleep when Appellant entered
the cell.  Appellant woke up Southern and
told him about the robbery on Zaragosa and Vista Del Sol.  Southern told Appellant that he had seen it
on the news and Appellant stated, AYeah,
that was us.@  According to Southern, Appellant told him
that he had the gun and that he, Ontiveros, and Condrin went into the
store.  Appellant pointed the gun at the
clerk, they got the money, and as they were leaving, the clerk started to reach
for something, so Appellant shot him and left. 
Appellant then told Southern that he ran through the desert on the side
of the Circle K, ran into a fence, cut himself, dropped the gun, and could not
find Ontiveros or Condrin, so he went his own way.  As Appellant was walking down Vista Del Sol,
he saw the police and tried to hide. 
After he came out of hiding, the police arrested him.  Southern did not know what happened after
that and had not seen or spoken to Appellant since that one encounter.  Southern identified Appellant in the
courtroom.  Southern acknowledged that he
was on probation for a felony conviction. 
He stated that he had not been offered or promised anything in exchange
for his testimony.

On cross‑examination,
Southern acknowledged that he had been interviewed on tape by a State
investigator in June 1994 and had not realized that during the interview he had
agreed that he was there to discuss a robbery at a ADiamond
Shamrock.@  Southern admitted that he had spoken to
Ontiveros= lawyer
before he had come forward to speak to the State investigator.  Ontiveros=
lawyer had asked Southern if he was willing to testify on Ontiveros= behalf.  Southern recalled the lawyer telling him that
his testimony would help Ontiveros out Aas
far as being blamed for shooting the clerk.@  Southern admitted that he has known Ontiveros
since childhood, however, he decided to come forward because he believed that
Ontiveros was not the shooter and because Ontiveros has a child and girlfriend.  Southern admitted that he was currently in
the El Paso County jail on a burglary of a
habitation charge, but stated again that he had not been promised anything for
his testimony.  Southern denied ever
seeing Ontiveros in the county jail.








The State called
codefendant Ontiveros as a witness. 
According to Ontiveros, some time before dawn, he, Condrin, and
Appellant left his house, traveled through alleys, cut across a reservoir,
turned up Manuel Acosta, jumped over a wall, walked next to a pond, and then
entered the Circle K.  Ontiveros identified
Appellant in the courtroom.  The three
men had discussed what they were going to do, but their plan was not Areal organized.@  Ontiveros stated that Appellant was the only
one who had a gun that night and that Lopez had lent it.  Ontiveros denied having a gun, despite being
aware that the store clerk had identified him as having a gun.  Ontiveros recalled that they were all wearing
dark clothing.

Ontiveros
testified that he ran into the store first, followed by Condrin, and then
Appellant.  Ontiveros recalled yelling at
the clerk and demanding money.  Mr.
Ontiveros stated that he grabbed the clerk for the money and was the first one
out the door.  As he was running out but
before he reached the door, Ontiveros heard a gunshot.  Ontiveros testified that he knew Appellant
had fired the gun because Appellant had the gun and had been pointing it.  As they left the store, Ontiveros yelled to
Appellant and Condrin, who were behind him, to follow him because he was the
only one who knew the route back. 
Ontiveros recalled hearing Appellant say that he had lost or dropped the
gun somewhere in their run.  The last
time he saw Appellant was when they were running back through the ponding area.  Ontiveros identified Mr. Richie=s backyard on Manuel Acosta as the one
he passed through en route to the store and on the way home.  Ontiveros was arrested later that night on
the same day that the offense was committed.








Ontiveros had pled
guilty to the offense.  Ontiveros
explained that in the plea agreement he entered in exchange for his testimony,
he is sentenced to ten years, but if Appellant received more or less, he would
receive the same sentence as Appellant. 
If Appellant was acquitted, Ontiveros=
sentence would be dropped to seven years. 
Further, if Appellant received probation, then Ontiveros would also
receive probation.  As part of his plea
agreement, Ontiveros had to turn over a codefendant and another witness.  While waiting to be released from jail,
Ontiveros spoke to Southern and while they were conversing, Southern told
Ontiveros that Appellant had been placed in his holding tank on the night of
the offense and had bragged about what had happened, what he had done, and the
persons involved in the robbery.  Later
that day, Appellant was placed into the same holding tank and Ontiveros asked
him why Ahe pulled
the trigger.@  Appellant told Ontiveros that he had thought
the clerk was reaching for a weapon or something.  Appellant did not deny pulling the
trigger.  Ontiveros stated that he was
testifying because he did not want to be blamed for something he had not done
and he was sorry for what happened to Mr. Hanson.  Ontiveros testified that he did not enter
into any agreement with Southern for Southern=s
testimony.

SUFFICIENCY
OF ACCOMPLICE TESTIMONY

In his first
issue, Appellant claims that the evidence is legally insufficient to support
his conviction because the accomplice witness testimony at trial lacked
sufficient corroborating evidence.  An
accomplice witness is someone who participated before, during, or after the
commission of the crime and could be prosecuted for the offense with which the
defendant was charged.  See Blake v.
State, 971 S.W.2d 451, 454‑55 (Tex.Crim.App. 1998); Kunkle v.
State, 771 S.W.2d 435, 439 (Tex.Crim.App. 1986).  It is undisputed that Ontiveros was an
accomplice as a matter of law.








Under Article
38.14 of the Texas Code of Criminal Procedure, a conviction cannot be had upon
the testimony of an accomplice unless corroborated by other evidence tending to
connect the defendant with the offense committed; and the corroboration is not
sufficient if it merely shows the commission of the offense.  See Tex.Code
Crim.Proc.Ann. art. 38.14 (Vernon 2005); Cathey v. State, 992
S.W.2d 460, 462 (Tex.Crim.App. 1999)(en banc). 
In conducting a sufficiency review under the accomplice witness rule, we
eliminate the accomplice testimony from consideration and then examine the
remaining evidence to determine whether there is other evidence that tends to
connect the accused with the commission of the crime.  Solomon v. State, 49 S.W.3d 356, 361
(Tex.Crim.App. 2001).  It is not
necessary that the corroborating evidence directly connect the defendant to the
crime or that it be sufficient by itself to establish the defendant=s guilt; it need only tend to connect
the defendant to the offense.  Vasquez
v. State, 67 S.W.3d 229, 236 (Tex.Crim.App. 2002); Cathey, 992
S.W.2d at 462.

Mere presence of a
defendant at the scene of the crime is insufficient to corroborate accomplice
witness testimony.  Cox v. State,
830 S.W.2d 609, 611 (Tex.Crim.App. 1992). 
However, evidence of the defendant=s
presence at the scene, coupled with other suspicious circumstances, even
seemingly insignificant ones, may well be enough to connect the defendant to
the offense.  Dowthitt v. State,
931 S.W.3d 244, 249 (Tex.Crim.App. 1996). 
Evidence that the defendant was in the presence of the accomplice at or
near the time or place of the offense is proper corroborating evidence.  McDuff v. State, 939 S.W.2d 607, 613
(Tex.Crim.App. 1997).  All facts and
circumstances in evidence may be looked at to determine whether an accomplice=s
testimony is corroborated.  Munoz v.
State, 853 S.W.2d 558, 560 (Tex.Crim.App. 1993)(en banc).  If the combined weight of the non‑accomplice
evidence tends to connect the defendant to the offense, the requirement of
Article 38.14 has been fulfilled.[3]  Gosch v. State, 829 S.W.2d 775, 777
(Tex.Crim.App. 1991).








In this case there
is sufficient non‑accomplice evidence that tends to connect Appellant to
the offense.  Mr. Hanson testified that
three individuals, two Hispanic males and one black male, committed the robbery
at the Circle K.  Mr. Hanson identified
Ontiveros and Condrin as two of the robbers, but did not identify the black
male.  The spot broadcast described the
suspects as two Hispanic or white males and one black male wearing dark
clothing.  The police apprehended
Appellant about four or five blocks away from the store about ten to fifteen
minutes after the spot broadcast.  Police
officers found shoe prints in the yard at 11967 Manuel Acosta that matched shoe
prints discovered off of Cezanne that led down to the reservoir.  The police officers also recovered a hooded‑black
sweatshirt and cap in the reservoir, which Lopez testified resembled the
clothing worn by Appellant when he last saw him.

Lopez testified on
the evening of September 29, to the early morning of September 30, Appellant
was in the company of Ontiveros, Condrin, and others.  Lopez identified Appellant in court.  Lopez stated that he gave Appellant his
father=s loaded
gun around three or four in the morning. 
Appellant left the Ontiveros house with Ontiveros and Condrin.  When Ontiveros and Condrin returned at dawn,
Ontiveros told Lopez that they had robbed a store.  Appellant did not return with them.

Mr. Richie
testified that in the early morning of September 30, two individuals scaled his
back wall at his residence at 11967 Manuel Acosta.  He saw three individuals crossing over the
hillside in the direction of the Circle K. 
He overheard a conversation which led him to believe that persons or
property were about to be threatened at the Circle K.  Mr. Richie called emergency 911 and minutes
later was informed that a robbery had occurred. 
While on the phone with the dispatcher, Mr. Richie heard footsteps
running through his backyard.








Southern testified
that when he was awoken by Appellant in his jail cell on September 30, Appellant
told him that he was involved in the robbery with Ontiveros and Condrin.  Southern identified Appellant in court.  According to Southern, Appellant told him
that he pointed the gun at the clerk, took the money, and then Appellant shot
the clerk.  Appellant=s atomic absorption test revealed that
all three elements to make a finding of gunshot residue were present, but not
in sufficient quantities to make a positive finding scientifically.

After eliminating
the accomplice witness testimony from our consideration and then examining the
non‑accomplice evidence, we conclude that the non‑accomplice
evidence does tend to connect Appellant to the offense sufficiently to
corroborate Ontiveros=
accomplice testimony.  Issue One is
overruled.

FACTUAL
SUFFICIENCY








In his second
issue, Appellant contends that the evidence was factually insufficient to
support, beyond a reasonable doubt, the element of Appellant=s identification as one of the alleged
robbers.  We begin the factual
sufficiency review with the presumption that the evidence is legally
sufficient.  Clewis v. State, 922
S.W.2d 126, 134 (Tex.Crim.App. 1996).  In
reviewing the factual sufficiency of the evidence, we must determine whether
considering all the evidence in a neutral light, the jury was rationally
justified in finding guilt beyond a reasonable doubt.  Zuniga v. State, 144 S.W.3d 477, 484
(Tex.Crim.App. 2004).  Evidence can be
factually insufficient if the evidence supporting the verdict, considered by
itself, is too weak to support the finding of guilt beyond a reasonable doubt,
or contrary evidence is so strong that guilt cannot be proven beyond a
reasonable doubt.  Id. at 484-85.  Our evaluation should not intrude upon the
fact finder=s role as
the sole judge of the weight and credibility given to any witness=s testimony.  Cain v. State, 958 S.W.2d 404, 407
(Tex.Crim.App. 1997).  We will not set
aside the judgment unless the evidence supporting the verdict is so weak as to
be clearly wrong and manifestly unjust.  Zuniga,
144 S.W.3d at 481.  A clearly wrong and
manifestly unjust verdict occurs where the jury=s
finding Ashocks
the conscience@ or Aclearly demonstrates bias.@ 
Id.  An opinion addressing factual sufficiency
must include a discussion of the most important and relevant evidence that
supports the appellant=s
complaint on appeal.  Sims v. State,
99 S.W.3d 600, 603 (Tex.Crim.App. 2003).

Appellant contends
that the evidence to sustain his conviction for aggravated robbery was
factually insufficient because there was no credible proof that Appellant was
identified as a participant in the robbery, no physical evidence to connect
Appellant to the hooded sweatshirt and hat, no evidence that the clothing found
was worn during the robbery, no identification of Appellant by Mr. Hanson, Mr.
Richie did not identify the individuals involved in the conversation he
allegedly heard, there was inconsistent testimony as to the color of the
firearm used in the robbery, and there was unreliable testimony by Southern and
Ontiveros at trial.








Ontiveros
testified that he, Condrin, and Appellant robbed the store clerk and that
Appellant was the only one with a gun that night, which Appellant had obtained
from Lopez.  According to Ontiveros,
Appellant fired the gun as they were leaving the store.  Ontiveros identified Mr. Richie=s backyard on Manuel Acosta as part of
the route to and back from the store. 
Ontiveros testified that they were all wearing dark clothing.  Ontiveros also testified that he had entered
a plea agreement in exchange for his testimony. 
Southern testified that Appellant told him that he had committed the
robbery on Zaragosa and Vista Del Sol and had admitted that he had shot the
store clerk.  Southern admitted that he
knew Ontiveros since childhood and was currently incarcerated, but stated that
he had not been offered or promised anything for his testimony.  Despite Appellant=s
contention that the testimony of both Ontiveros and Southern is inherently
untrustworthy, the jury as the fact finder is the sole judge of the weight and
credibility of the witnesses.  See
Cain, 958 S.W.2d at 407.

Appellant
correctly points out that no physical evidence connected Appellant to the
hooded sweatshirt and cap recovered from the ponding area of the reservoir nor
was there evidence that this clothing was worn during the robbery.  While it is true that Mr. Hanson was unable
to identify Appellant, he was able to identify Ontiveros and Condrin as participants.  Further, Mr. Hanson recalled seeing Ontiveros
holding a dark colored revolver, however, he identified the gun used in the
robbery as a Smith and Wesson snub-nose, .357 Magnum, stainless steel, which
was a similar description to the gun that Lopez testified he had taken from his
father and had given to Appellant that night. 
Appellant also points out that Mr. Richie never identified the
individuals he overheard, but Ontiveros=
testimony as to their route to the store was consistent with Mr. Richie=s testimony.  After reviewing all the evidence in a neutral
light, including the accomplice testimony, we conclude that is was factually
sufficient to sustain Appellant=s
conviction because the evidence is not too weak to support the guilty finding
beyond a reasonable doubt nor is any contrary evidence so strong that guilt
could not be proven beyond a reasonable doubt. 
Issue Two is overruled.

We affirm the
trial court=s
judgment.

October
19, 2006

DAVID WELLINGTON
CHEW, Justice

 

Before McClure, J., Chew, J., and Barajas, C.J. (Ret.)

Barajas, C.J. (Ret.)(Sitting by Assignment)

 

(Do Not Publish)











[1]
Atomic absorption test was conducted on the hands of Appellant and Lopez to
determine the presence of any gunshot residues. 
Appellant=s test
revealed that all three elements that must be present to make a finding of
gunshot residue were present, but not in quantities sufficient to make a
positive finding of gunshot residue. 
Lopez=s test
was missing one of the three required elements. 
Officer Ernest Wade testified that if all three elements are present,
that indicates that the person fired a gun or was in the immediate vicinity of
someone who fired a gun, but scientifically they cannot conclude the presence
of gunshot residue without a sufficient quantity.  





[2]
Lopez=s father,
Francisco Lopez, testified that on September 30, 1993, he was working as a
Border Patrol agent, but had traveled to Dallas
on a trip.  He stated that he had left
his loaded Smith and Wesson, model 66, .357 Magnum, short‑barrel chrome‑colored
revolver in his bedroom, which was accessible to his wife and all of his sons,
including Tomas Lopez.  Lopez=s father no longer had the gun and had
never found it thereafter. 





[3]
In his brief, Appellant provides the legal sufficiency standard of review for
his first issue, however, the sufficiency of non-accomplice testimony under
Article 38.14 is a statutorily imposed sufficiency review which is not derived
from federal or state constitutional principles that define the traditional legal
and factual sufficiency standards.  See
Cathey, 992 S.W.2d at 462‑63.