Jeromy Michael Jolley a/k/a Jeromy M. Jolley

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-04-503-CR

JEROMY MICHAEL JOLLEY APPELLANT

A/K/A JEROMY M. JOLLEY

V.

THE STATE OF TEXAS STATE

------------

FROM CRIMINAL DISTRICT COURT NO. 2 OF TARRANT COUNTY

------------

MEMORANDUM OPINION
(footnote: 1)

------------

I.  Introduction

Appellant Jeromy Michael Jolley appeals his conviction for murder.  A jury found Jolley guilty and assessed his punishment at seventy-five years’ confinement.  The trial court sentenced him accordingly.  In three points, Jolley challenges the legal and factual sufficiency of the evidence and the trial court’s admission of allegedly hearsay testimony.  We will affirm.

II.  Factual Background

A. Accomplice Witness Testimony
(footnote: 2)
 Brian Taylor testified that on the night of July 31, 2003, he partied with his girlfriend and eventually drove her home in her car.  Taylor paged Jolley, and Jolley followed the couple in his truck to Taylor’s girlfriend’s home.  Taylor then joined Jolley in Jolley’s truck, and they went to run an errand.  

As Jolley drove, he asked Taylor if he wanted to smoke a blunt
(footnote: 3) and handed Taylor a bag of marijuana.  Jolley was driving on Interstate 820, and Taylor was about to start making the blunt when Jolley’s truck hit the rear of a Chevy pickup traveling in front of them.  Taylor heard the brakes squeal and put out his hand in front of his head; Taylor’s hand and head cracked Jolley’s windshield.  Jolley’s truck died and coasted to the left-hand shoulder of the road.  Taylor said that Jolley tried unsuccessfully to restart the truck so that they could leave because they were both under the influence of alcohol.  Taylor described Jolley as “very mad.”

When Jolley’s truck would not start, Taylor and Jolley got out and approached the driver’s side window of the other pickup.  Jolley and the driver of the other vehicle—Juan Gallegos
(footnote: 4)—began yelling at each other about who was at fault for the accident.  Jolley yelled that Mr. Gallegos had “brake-checked” him, and Mr. Gallegos said that the wreck was Jolley’s fault because he had been driving too fast.  Taylor hit Mr. Gallegos in the face through the open window of the truck.  Jolley then opened the door of Mr. Gallegos’s truck,
(footnote: 5) and he and Taylor punched Mr. Gallegos.  Eventually, Taylor stepped back, but Jolley leaned almost all the way inside the truck and continued to strike Mr. Gallegos.
(footnote: 6) 

Mr. Gallegos exited his truck through the passenger side door and ran away.  Taylor commented that Mr. Gallegos did not appear to be mortally wounded because he saw Mr. Gallegos jump over a guard rail and hurry down an  embankment.  Taylor did not notice blood on Mr. Gallegos, but the 5 a.m. darkness limited visibility.  At that time, Taylor did not know that Mr. Gallegos had been stabbed.

Jolley’s truck still would not start, so Jolley got in Mr. Gallegos’s truck, Taylor got in Jolley’s truck, and Jolley pushed his truck with Mr. Gallegos’s truck while Taylor steered.  Taylor called Jeff Feaster and Kenny Gabel, who owned a nearby mechanic’s shop, to get them to unlock the shop so that Jolley could park his truck there out of view.  Jolley and Taylor successfully pushed Jolley’s truck to the mechanic’s shop.  Either right before they left the accident scene or right after they arrived at the shop, Jolley told Taylor that he—Jolley—had stabbed Mr. Gallegos.  Taylor asked where and how many times Jolley had stabbed Mr. Gallegos, and Jolley demonstrated the locations where he had stabbed Mr. Gallegos by patting Taylor’s left side from his knee to his armpit.  Jolley said that he did not know how many times he stabbed Mr. Gallegos.  Jolley did not say what he had used to stab Mr. Gallegos; Taylor assumed that Jolley had used a knife that he always carried. 

Taylor knew that the Haltom City Police Department patrolled the area surrounding the mechanic’s shop, so he drove Mr. Gallegos’s truck some distance away and drove it into a ravine.  After Taylor disposed of Mr. Gallegos’s truck, he returned to the shop.  By that time, Gabel had unlocked the shop, and Gabel, Cody Clanton, Little Ronnie, and two other men were at the shop.  According to Taylor, Jolley broke the blade off of Jolley’s knife and threw the blade towards some weeds outside the shop.  Taylor noticed  blood on his knuckles and went to wash his hands.  When he returned, Jolley and Clanton had left the shop.  

That evening, Taylor, Jolley, and Jolley’s girlfriend Mary were all at Feaster’s and Gabel’s apartment.  Ultimately it was decided that Mr. Gallegos’s truck should be burned to eliminate any fingerprints.  Taylor, Jolley, and Mary went together to purchase gas and to locate Mr. Gallegos’s truck but decided not to burn it that night because they were worried about being seen by people outside at a nearby house.  The next day, Jolley attempted unsuccessfully to find the truck on his own to burn it.  He called Taylor, and Taylor helped him locate Mr. Gallegos’s truck.  

Taylor testified that he did not stab Mr. Gallegos, that he had never said that he had stabbed Mr. Gallegos, that Jolley had never accused him of stabbing Mr. Gallegos, and that he did not intend for Mr. Gallegos to be seriously injured.

B. 
Non-Accomplice Witness Testimony

On August 1, 2003, a truck driver discovered a man lying on the side of the road near some restaurants.  The truck driver could tell that the man had been stabbed and called 911.  Paramedics arrived and confirmed that the man was dead. 

Robert Presney, the crime scene officer, testified that no weapon or cell phone was found at the scene.  Detective Sarah Jane Waters testified that after the medical investigator arrived, police were able to move the body, to go through the man’s pockets, to locate his driver’s license, and to identify the man as Mr. Gallegos. 

Several days later, Detective Waters received a call that police had located Mr. Gallegos’s truck; it had been driven into a ravine and burned.  She obtained records of Mr. Gallegos’s cell phone calls and noticed a 911 call made on August 1, 2003, at 5:15 a.m.  She obtained a tape of the 911 call from Haltom City and cleaned the tape to remove static and background noise.  But she was still unable to determine the identity of the persons other than Mr. Gallegos whose voices were on the tape, so she decided to release the tape to the media in the hope of obtaining additional information about Mr. Gallegos’s death.  After the media published the tape of Mr. Gallegos’s 911 call, tips came in mentioning several suspects, including Jolley and Taylor.  Detective Waters spoke with several individuals who had discussed the offense with Taylor, and the information she gathered indicated that Jolley was the aggressor in the incident with Mr. Gallegos.  Approximately seven months later, police located a knife handle on the roof of a shop near Feaster’s mechanic shop. 

Kenny Gabel testified that in 2003 he owned a mechanic’s shop with and shared an apartment with Jeff Feaster.  Gabel knew Jolley through Taylor.  Gabel said that Taylor called him at 5:24 a.m. on August 1, 2003, and asked him to come back to the shop and to open it.  When Gabel arrived at the shop, Taylor and Jolley were already there.  Gabel saw Jolley’s black Nissan truck pulled up to the shop’s bay door.  When Gabel realized that he did not have the key to the shop, Taylor became hysterical, saying that he needed to put Jolley’s truck in the shop and could not leave it outside because they had been involved in an accident.  Gabel retrieved the shop key from his apartment and came back and opened the shop. Taylor and Jolley both started talking about the incident.  Gabel learned that Taylor initially spoke with Mr. Gallegos after the accident and that there was an argument regarding who was at fault.  Jolley came over and joined in the argument.  Gabel heard Jolley and Taylor say that they saw Mr. Gallegos lean over and that it looked like he might be grabbing a weapon.
(footnote: 7)  At that point, Taylor told Jolley to “get him.”  Taylor and Jolley reached into the pickup to stop Mr. Gallegos; Jolley pulled his pocket knife
(footnote: 8) and stabbed Mr. Gallegos a couple of times in the leg.
(footnote: 9)  After being stabbed, Mr. Gallegos got out of the truck through the passenger door and ran away.  As Jolley was talking about the stabbing, he showed Gabel some blood on his wrist and on his watch. During this conversation, neither Taylor nor Jolley indicated that Mr. Gallegos had been killed.  About four or five days after the accident, Gabel learned that Mr. Gallegos had died. 

Cody Clanton, Jolley’s best friend since first grade, testified that on July 31, 2003, he, Jolley, a friend named Derrick Bowman, and others were partying at Brian Picken’s
(footnote: 10) house.  Clanton did not realize that Jolley had left Picken’s house until Bowman received a call at 5:42 a.m. from Jolley.  In response to the call, Clanton and Bowman went to Gabel and Feaster’s mechanic shop.  When they arrived at about 6 a.m., Clanton saw that Gabel, Jolley, and Taylor were already at the shop.  Clanton noticed that Taylor had blood on his arms.  Clanton also noticed that Jolley had blood on his arms and shirt and that his Nissan truck’s front end was mangled. 

Jolley wanted to leave and go to his grandmother’s house, and Clanton drove him there.  During the drive, Jolley talked to Clanton about the events from the early morning of August 1, 2003.  Jolley told Clanton that he had picked up Taylor from Taylor’s girlfriend’s house and that they got on Interstate 820 to go back to a party.  Jolley said that when he looked down to check Taylor’s progress in making the blunt, he had an accident with Mr. Gallegos.  Jolley said that Mr. Gallegos had “brake-checked” him and that he had hit Mr. Gallegos. Jolley said that when he and Taylor got out of his truck, Mr. Gallegos was already on the phone dialing 911.  Taylor said, “[L]et’s get him,” got on top of Mr. Gallegos, pinned Mr. Gallegos, and punched him.  Jolley said that he approached Mr. Gallegos’s truck with his own pocket knife drawn and started stabbing Mr. Gallegos.
(footnote: 11)  Jolley said that Mr. Gallegos fled the truck through the passenger side door and ran across the highway.  Jolley’s truck would not start, so Jolley used Mr. Gallegos’s truck to push it—with Taylor steering—to the shop.  Jolley said he destroyed his knife by opening the driver’s door and grinding the blade on the concrete.  He said that he threw the knife handle on the top of a nearby shop. 

On the night of August 1, 2003, Clanton and Jolley went to Taylor’s house, and Jolley asked Taylor where he had “ditched” Mr. Gallegos’s truck.  Taylor provided a description of the truck’s location, and Clanton and Jolley went to find it.  They could not find the truck and stopped looking for it at approximately 1 a.m.  During the drive back to Jolley’s grandmother’s house, Jolley tried out different alibis on Clanton; Clanton described them as a “[cockamamie] scheme that [Jolley] tries to put on to somebody else.”  For instance, Jolley said that Taylor was the stabber because Jolley is left-handed and because Mr. Gallegos’s stab wounds were on the left side. 

Jolley called Clanton on August 3, 2003.  Jolley wanted to obtain a better description of the truck’s location from Taylor.  Jolley said that he, Mary, and Bowman had unsuccessfully looked for the truck the previous day.  Eventually, Clanton, Jolley, and Taylor loaded up Taylor’s motorcycle and drove to an area near the shop; Taylor used his motorcycle to take Jolley to the truck.  Clanton and Jolley left and purchased some gas; afterwards, Clanton set the truck on fire.  After the truck had been burned, Jolley told some people that the evidence was gone and said that he wanted to plant one of his guns in the burned truck so it appeared he stabbed Mr. Gallegos in self defense after Mr. Gallegos pulled a gun. 

Clanton said that he and Jolley separately heard the 911 tape.  Jolley told Clanton that he could hear Taylor’s voice on the tape saying, “Let’s get him.” Clanton heard Jolley saying, “You brake-checked me,” and Jolley admitted to Clanton that the voice was his.  Clanton agreed that, because of the media coverage, he knew that Mr. Gallegos had died before he set Mr. Gallegos’s truck on fire. 

Dr. Daniel Konzelmann, a Deputy Medical Examiner in the Tarrant County Medical Examiner’s Office, testified that he performed the autopsy on Mr. Gallegos.  Dr. Konzelmann noted sharp-force injuries to Mr. Gallegos’s left chest, left abdomen or belly, left lower arm, and left thigh and leg; he also noted some scrapes on the face and the right knee.  Dr. Konzelmann stated that none of the wounds to the head were life threatening; the wound to the left upper chest was not fatal in and of itself; the wound to the heart (described as wound number two in the report and in his testimony) was fatal and was the most important wound; and with proper medical care, the wound to the left lower chest (described as wound number three in the report and in his testimony) at the costal margin might be survivable.  Overall, wound numbers two and three were the most immediate and life threatening.  Dr. Konzelmann said that the wounds appeared to be knifelike.  He concluded that the cause of death was sharp-force wounds and that the manner of death was homicide.

III.  Sufficiency of the Evidence

In his first and second points, Jolley complains that the evidence is legally and factually insufficient.  Specifically, Jolley contends that the State failed to prove beyond a reasonable doubt that Jolley stabbed Mr. Gallegos in the chest—the two fatal wounds—not just in the leg and that Jolley intended to cause Mr. Gallegos’s death or intentionally committed an act clearly dangerous to human life.

A. Legal Sufficiency Standard of Review

In reviewing the legal sufficiency of the evidence to support a conviction, we view all the evidence in the light most favorable to the verdict in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  
Jackson v. Virginia
, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); 
Hampton v. State
, 165 S.W.3d 691, 693 (Tex. Crim. App. 2005).

This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.  
Jackson
, 443 U.S. at 319, 99 S. Ct. at 2789.  The trier of fact is the sole judge of the weight and credibility of the evidence.  
See
 Tex. Code Crim. Proc. Ann.
 art. 38.04 (Vernon 1979); 
Margraves v. State
, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000).  Thus, when performing a legal sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the fact finder.  
Dewberry v. State
, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999), 
cert. denied
, 529 U.S. 1131 (2000).  We must resolve any inconsistencies in the evidence in favor of the verdict.  
Curry v. State
, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).

The sufficiency of the evidence should be measured by the elements of the offense as defined by the hypothetically correct jury charge for the case.  
Malik v. State
, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997); 
Ortiz v. State
, 993 S.W.2d 892, 895 (Tex. App.—Fort Worth 1999, no pet.).  Such a charge would be one that accurately sets out the law, is authorized by the indictment, does not unnecessarily restrict the State’s theories of liability, and adequately describes the particular offense for which the defendant was tried.  
Gollihar v. State
, 46 S.W.3d 243, 253 (Tex. Crim. App. 2001); 
Malik, 
953 S.W.2d at 240.  The law as authorized by the indictment means the statutory elements of the charged offense as modified by the charging instrument.  
See Curry
, 30 S.W.3d at 404.

B. Factual Sufficiency Standard of Review

In reviewing the factual sufficiency of the evidence to support a conviction, we are to view all the evidence in a neutral light, favoring neither party.  
See Zuniga v. State
, 144 S.W.3d 477, 481 (Tex. Crim. App. 2004).  The only question to be answered in a factual sufficiency review is whether, considering the evidence in a neutral light, the fact finder was rationally justified in finding guilt beyond a reasonable doubt.  
Id
. at 484.  There are two ways evidence may be factually insufficient:  (1) when the evidence supporting the verdict or judgment, considered by itself, is too weak to support the finding of guilt beyond a reasonable doubt; or (2) when there is evidence both supporting and contradicting the verdict or judgment and, weighing all of the evidence, the contrary evidence is so strong that guilt cannot be proven beyond a reasonable doubt.  
Id
. at 484-85.  “This standard acknowledges that evidence of guilt can ‘preponderate’ in favor of conviction but still be insufficient to prove the elements of the crime beyond a reasonable doubt.”  
Id
. at 485.  In other words, evidence supporting a guilty finding can outweigh the contrary proof but still be insufficient to prove the elements of an offense beyond a reasonable doubt.  
Id
.   In performing a factual sufficiency review, we are to give deference to the fact finder’s determinations, including determinations involving the credibility and demeanor of witnesses.  
Id.
 at 481; 
Cain v. State
, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).  We may not substitute our judgment for the fact finder’s.  
Zuniga, 
144 S.W.3d at 482.  

A proper factual sufficiency review requires an examination of all the evidence.  
Id
. at 484, 486-87.  An opinion addressing factual sufficiency must include a discussion of the most important and relevant evidence that supports the appellant’s complaint on appeal.  
Sims v. State
, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003).

C. Standard for Corroborating Accomplice Witness Testimony

The court of criminal appeals has held that the accomplice witness rule, Texas Code of Criminal Procedure article 38.14,
(footnote: 12) is a statutorily imposed sufficiency review that is not derived from federal or state constitutional principles that define the legal and factual sufficiency standards.  
Cathey v. State
, 992 S.W.2d 460, 462-63 (Tex. Crim. App. 1999), 
cert. denied
, 528 U.S. 1082 (2000).  The accomplice witness rule is satisfied if there is some non-accomplice evidence that tends to connect the accused to the commission of the offense.  
Gill v. State
, 873 S.W.2d 45, 48 (Tex. Crim. App. 1994) (citing 
Gosch v. State
, 829 S.W.2d 775, 777 (Tex. Crim. App. 1991), 
cert. denied
, 509 U.S. 922 (1993)).  The corroborative evidence need not directly link the accused to the crime or be sufficient in itself to establish guilt beyond a reasonable doubt.  
Id.
 at 48; 
Gosch
, 829 S.W.2d at 777.
  The corroborative evidence may be circumstantial or direct.  
Gosch
, 829 S.W.2d at 777
; 
Paulus v. State
, 633 S.W.2d 827, 843 (Tex. Crim. App. [Panel Op.] 1981).

Although an appellant’s presence with the accomplice witnesses before and after the offense is insufficient to corroborate the accomplice witness’s testimony, it is an important circumstance to be considered.  
Cox v. State
, 830 S.W.2d 609, 611 (Tex. Crim. App. 1992); 
see, e.g., Gill
, 843 S.W.2d at 49.  Motive and opportunity to commit the offense may be evidence which connects the accused to the offense.  
Cox
, 830 S.W.2d at 612; 
Paulus
, 633 S.W.2d at 846.  Moreover, ill will toward the deceased may be a factor which may corroborate accomplice witness testimony.  
See, e.g., Rodriquez v. State
, 508 S.W.2d 80, 83 (Tex. Crim. App. 1974).

Judicial experience shows that no precise rule exists to measure the amount of evidence required to corroborate accomplice witness testimony.  
Gill
, 873 S.W.2d at 48.  Each case must be evaluated on its own unique facts.  
Id.
  All facts and circumstances may be looked to as furnishing the necessary corroboration.  
Mitchell v. State
, 650 S.W.2d 801, 807 (Tex. Crim. App. 1983), 
cert. denied
, 464 U.S. 1073 (1984).

D. Analysis

We begin our analysis by determining whether the State met its burden under article 38.14 to offer non-accomplice witness evidence tending to connect Jolley with the offense.  
Under the requirements of article 38.14, we eliminate from our analysis of the evidence the evidence offered by the accomplice witness, here Taylor, and examine the other evidence to determine if there is sufficient corroborating evidence tending to connect Jolley to the commission of Mr. Gallegos’s murder.  
See
 
Hernandez v. State
, 939 S.W.2d 173, 176 (Tex. Crim. App. 1997).

Although none of the non-accomplice witnesses testified that Jolley stabbed Mr. Gallegos in the chest area where the fatal wound was inflicted,
 the record reveals that numerous non-accomplice witnesses testified that Jolley admitted to the stabbing.  Gabel testified that Jolley said he pulled out his own pocket knife and stabbed Mr. Gallegos a couple of times in the leg.  Clanton, who likewise obtained his information from Jolley, testified that Jolley stabbed Mr. Gallegos two times in the leg with Jolley’s own pocket knife.  Clanton also testified that Jolley said that he threw the handle of the knife on the top of the shops.

The non-accomplice witnesses also testified that they never heard that Taylor stabbed Mr. Gallegos.  Non-accomplice witness testimony likewise confirmed that the knife handle found on the roof of a shop near the mechanic’s shop 
was similar to the one owned by Jolley 
and was found in the location where Clanton testified that Jolley had disposed of it.  
Non-accomplice witness testimony also existed that Jolley made up the story that Mr. Gallegos was armed.

Excluding Taylor’s testimony, as mandated by article 38.14, the remaining evidence sufficiently corroborates Taylor’s accomplice witness testimony and satisfies the requirements of article 38.14.  
See Mitchell
, 650 S.W.2d at 808 (holding that evidence independent of accomplice witnesses tended to connect appellant with crime charged and sufficiently corroborated accomplice witness’s testimony).  
We hold that Taylor’s accomplice witness testimony was sufficiently corroborated. 

We now analyze Jolley’s claims 
that the evidence is legally and factually insufficient to establish that he stabbed Mr. Gallegos in the chest, intended to cause Mr. Gallegos’s death, or intentionally committed an act clearly dangerous to human life.  We consider all of the evidence—
including Taylor’s sufficiently corroborated accomplice witness testimony.  
See Jackson
, 443 U.S. at 319, 99 S. Ct. at 2789; 
Zuniga
, 144 S.W.3d at 481.  The jury was charged that it could find Jolley guilty (1) if he intentionally or knowingly caused Mr. Gallegos’s death by stabbing him with a knife, (2) if he intentionally, with the intent to cause serious bodily injury to Mr. Gallegos, stabbed him with a knife, causing Mr. Gallegos’s death, or (3) if, under the law of parties, he assisted Taylor to commit the offense.  
See
 
Tex. Penal Code Ann
. §§ 7.01-.02, 
19.02(b)(1), (2) (Vernon 2003).

Taylor’s corroborated accomplice witness 
testimony is legally and factually sufficient to establish that Jolley 
stabbed Mr. Gallegos in the chest with the requisite intent
.  
Taylor testified, and the jury was free to believe that, in response to Taylor's question about where Jolley stabbed Mr. Gallegos, 
Jolley patted Taylor all the way up his left side from above the knees to the armpit.  Additionally, several of Jolley and Taylor's acquaintances testified that Jolley admitted that he used his knife and that he stabbed Mr. Gallegos.  The acquaintances testified that Jolley never claimed that Taylor stabbed Mr. Gallegos.

Viewing the evidence in the light most favorable to the verdict, we hold that a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt.  
Jackson
, 443 U.S. at 319, 99 S. Ct. at 2789; 
Burden v. State
, 55 S.W.3d 608, 612 (Tex. Crim. App. 2001).  Furthermore, viewing all the evidence in a neutral light, favoring neither party, we conclude that evidence exists supporting the elements necessary for the jury to find Jolley guilty of murder.  
See
 
Tex. Penal Code Ann
. §§ 7.01-.02, 
19.02(b)(1), (2)
.  Evidence supporting the verdict, taken alone, is not too weak to support the finding of guilt beyond a reasonable doubt, and the contrary evidence is not so strong that guilt cannot be proven beyond a reasonable doubt.  
Dotson v. State
, 146 S.W.3d 285, 295 (Tex. App.—Fort Worth 2004, pet. ref’d); 
see also Meeks v. State
, 135 S.W.3d 104, 112-13 (Tex. App.—Texarkana 2004, pet. ref’d) (finding sufficient corroborating evidence of accomplice testimony that tends to connect appellant to offense and holding evidence factually sufficient).  We overrule Jolley’s first and second points.

IV.  Hearsay Evidence

In his third point, Jolley contends that the trial court abused its discretion by admitting hearsay evidence.  Specifically, Jolley argues that the following portions of Gabel’s testimony were wrongly admitted into evidence as adoptive admissions:

[PROSECUTOR:]  Did that truck ever start while you were there?

A.  Not during that day, no.

Q.  At this point is it still just you, Bria[n] Taylor[,] and Jeromy Jolley?

A.  Yes.

Q.  What happened next?

A.  I seen the damage to the vehicle[,] and it looked like he had hit a guard rail.  That is what I was told, you know, that they  --

[DEFENSE COUNSEL:]  Objection, hearsay.

Q.  [PROSECUTOR:] Who told you?

A.  Either Brian or Jeromy.  I don’t remember who, one of the two.

Q.  When you were told, were they both together or separate?

A.  We were all three together.

. . . .

Q.  Okay.  Did you hear anything else?  What did you hear next?

A.  Well, I heard next -- it’s kind of [a] mixture of what Brian and Jeromy had both said, so I can’t differentiate who [is] saying the exact word.  We were all three talking.

Q.  Let me ask you questions about that.  When you say all three, Brian and Jeromy [were] there together, telling the story at some points?

A.  Yes.

Q.  Okay.  When Brian adds in something, tells a portion of it, is Jeromy objecting to it or correcting it or he is agreeing with it?

A.  Not that I remember.  He didn’t object to it.

[PROSECUTOR]:  Your Honor, I’m going to offer all of this, either as an admission of party opponent or admission of party opponent through test admission from a statement against interest -- I object it is a hearsay exception --
(footnote: 13)

[DEFENSE COUNSEL]:  Your Honor, may I take this witness on voir dire?

THE COURT:  Yes.

VOIR DIRE EXAMINATION

BY [DEFENSE COUNSEL]:

. . . .

Q.  Good.  Regarding the conversation that you are now talking with the Prosecution about where Brian and Jeromy are speaking with you --

A.  Yes.

Q.  -- and your testimony has just been that Brian would say some things and that Jeromy would not object?

A.  Yes.

Q.  Was it just like Brian was making a statement, and not that Jeromy agreed or disagreed, when you finished . . . making that statement, then Jeromy would say whatever he needed to say?  Is that basically what happened?  Not that he was agreeing with what Brian stated, but what Brian stated, most times people don’t talk at the same time.  So after Brian completed his statement, then Jeromy made a statement?

A.  No, ma’am.  At this -- this particular incident, they were both speaking at the same time.

Q.  Okay.  I understand they may have been speaking at the same time.

A.  Yes.

Q.  When we are saying “at the same time[,]” are you meaning [that] you are in a group and having this conversation together?

A.  Yes.

Q.  Okay.  And what I’m talking about, just like you and I are talking right now, and I may say, well, I came here today [and] it was raining outside, dah, dah, dah, and you are saying, well, you came here today and it wasn’t raining outside, or you had to park four blocks down, not really trying to dispute what I was saying, you are just saying what you did that day.

Do you understand what I’m saying?

A.  I’m trying to follow.

Q.  Okay.  The conversation between Brian, yourself[,] and Jeromy, Brian basically talked to you, say things to you, and then also Jeromy stated things to you.  Neither one was saying, oh, yeah, that is correct; oh, yeah, that is what happened.  Did anybody state that?

A.  No, ma’am.

Q.  Okay.  So basically you understand that there were two individuals you were listening to; is that correct?

A.  Yes, ma’am.

Q.  And one particular individual -- either Brian Taylor made certain statements to you, and then another individual, Jeromy Jolley, may have made statements to you.  Do you understand that?

A.  Yes, ma’am.

Q.  And whatever Jeromy stated to you may have been different than what Brian Taylor stated to you; is that correct?  They didn’t both say the same thing?

A.  No, ma’am.

[DEFENSE COUNSEL]:  Your Honor, I’m going to have to object.  I mean, if he cannot differentiate between who made what statement, it’s not fair to my client.  It’s not giving us proper notice.  And I don’t think it is going to be an exception to the hearsay rule.

THE COURT:  All right.  I’ll overrule that. 

We review a trial court's ruling admitting or excluding evidence for an abuse of discretion.  
Prystash v. State
, 3 S.W.3d 522, 527 (Tex. Crim. App. 1999),
 cert. denied
, 529 U.S. 1102 (2000); 
Montgomery v. State
, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g).  Appellate courts should give great discretion to the trial courts, reversing only if the trial court acts outside “the zone of reasonable disagreement.”  
Montgomery
, 810 S.W.2d at 391.  Thus, so long as the trial court's decision to admit or exclude evidence falls in the zone within which reasonable minds may differ, appellate courts should refrain from disturbing the trial court's decision on appeal.  
Id.
;  
Karnes v. State
, 127 S.W.3d 184, 189 (Tex. App.—Fort Worth 2003, no pet.). 

Rule of evidence 801(e) identifies circumstances in which certain statements are not hearsay.  
Paredes v. State
, 129 S.W.3d 530, 534 (Tex. Crim. App. 2004).  A statement offered against a party which is “a statement of which the party has manifested an adoption or belief in its truth” is not hearsay.  
Tex. R. Evid.
 801(e)(2)(B); 
Paredes
, 129 S.W.3d at 534.  A party’s silence may be sufficient to establish an adoptive admission.  
See Alvarado v. State
, 912 S.W.2d 199, 215 (Tex. Crim. App. 1995).

Here, the record demonstrates that Jolley and Taylor were talking and saying the same thing.  Gabel could not distinguish between the two, who were giving identical accounts of the events in question.  There is nothing to show that Jolley did not hear the statements; instead, the record reveals that all three of the men—Jolley, Taylor, and Gabel—were together when the details of the event were being relayed.  Some of the statements may not have been made by both Jolley and Taylor, but Jolley did not contradict Taylor or claim that what Taylor was saying was not true.  Because these statements fall within the adoptive admission category of nonhearsay, the trial court did not abuse its discretion by concluding that the statements were admissible as adoptive admissions.  
See, e.g.,
 
Paredes
, 129 S.W.3d at 535-36 (holding no abuse of discretion existed admitting adoptive admission of defendant); 
Martinez, 
131 S.W.3d at 37 (same).  We overrule Jolley’s third point.

V.  Conclusion

Having overruled all of Jolley’s points, we affirm the trial court’s judgment.

PER CURIAM

PANEL F: WALKER, LIVINGSTON, and DAUPHINOT, JJ.

DO NOT PUBLISH

Tex. R. App. P.
 47.2(b)

DELIVERED: January 26, 2006

FOOTNOTES
1:
See
 
Tex. R. App. P
. 47.4.

2:
The issue of whether Taylor was an accomplice in fact was submitted to the jury.  Jolley did not request that the jury be instructed that Taylor was an accomplice as a matter of law or object to the charge on this ground.

3:
A blunt is a cigar that has been hollowed out and filled with marijuana.

4:
Although Jolley and Taylor did not know the name of the other driver at this time, we use his name for ease of reference.

5:
Taylor’s October 9, 2003 written statement said that “one of us” opened the door.

6:
Taylor testified that, during this time, although he could not see Jolley’s hands he did not see a weapon.

7:
Although Gabel remembered hearing Jolley say that Mr. Gallegos “looked like he was pulling a gun out,” he said Jolley grinned when he said it and kind of looked at Gabel, leading Gabel to conclude that it was not true but that Jolley intended to use it as an excuse in the event he was caught.  However, Taylor also told Gabel that he thought Mr. Gallegos had a weapon. 

8:
Jolley told Gabel that Jolley had destroyed the knife on the way to the shop. 

9:
Gabel could not remember if Jolley was the exact person who said that he had stabbed Mr. Gallegos; Gabel heard that Jolley had stabbed Mr. Gallegos from both Taylor and Jolley.  However, Gabel never heard that Taylor had done the stabbing. 

10:
Brian Picken is also referred to as Brian Pippen in the record.

11:
Although Clanton initially testified that Jolley did not state how many times he stabbed Mr. Gallegos, Clanton’s prior written statement recited that Jolley stabbed Mr. Gallegos two times in the leg. 

12:
The accomplice witness rule provides that “[a] conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense.”  
Tex. Code Crim. Proc. Ann.
 art. 38.14 (Vernon 2005).

13:
Although the objection appears in the reporter’s record as set forth above, we believe that the objection should have been attributed to defense counsel before he took the witness on voir dire.