COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-04-503-CR

 

 

JEROMY MICHAEL JOLLEY                                                   APPELLANT

A/K/A JEROMY M. JOLLEY

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

        FROM CRIMINAL
DISTRICT COURT NO. 2 OF TARRANT COUNTY

 

                                              ------------

 

                                MEMORANDUM OPINION[1]

 

                                              ------------

 

I.  Introduction

 








Appellant Jeromy Michael Jolley appeals his
conviction for murder.  A jury found
Jolley guilty and assessed his punishment at seventy-five years=
confinement.  The trial court sentenced
him accordingly.  In three points, Jolley
challenges the legal and factual sufficiency of the evidence and the trial
court=s
admission of allegedly hearsay testimony. 
We will affirm.

II.  Factual Background

A.     Accomplice Witness Testimony[2]

Brian Taylor testified that on the night of July
31, 2003, he partied with his girlfriend and eventually drove her home in her
car.  Taylor paged Jolley, and Jolley
followed the couple in his truck to Taylor=s
girlfriend=s home.  Taylor then joined Jolley in Jolley=s truck,
and they went to run an errand.  








As Jolley drove, he asked Taylor if he wanted to
smoke a blunt[3]
and handed Taylor a bag of marijuana. 
Jolley was driving on Interstate 820, and Taylor was about to start
making the blunt when Jolley=s truck
hit the rear of a Chevy pickup traveling in front of them.  Taylor heard the brakes squeal and put out
his hand in front of his head; Taylor=s hand
and head cracked Jolley=s windshield.  Jolley=s truck
died and coasted to the left-hand shoulder of the road.  Taylor said that Jolley tried unsuccessfully
to restart the truck so that they could leave because they were both under the
influence of alcohol.  Taylor described
Jolley as Avery mad.@

When Jolley=s truck
would not start, Taylor and Jolley got out and approached the driver=s side
window of the other pickup.  Jolley and
the driver of the other vehicleCJuan
Gallegos[4]Cbegan
yelling at each other about who was at fault for the accident.  Jolley yelled that Mr. Gallegos had Abrake-checked@ him,
and Mr. Gallegos said that the wreck was Jolley=s fault
because he had been driving too fast. 
Taylor hit Mr. Gallegos in the face through the open window of the
truck.  Jolley then opened the door of
Mr. Gallegos=s truck,[5]
and he and Taylor punched Mr. Gallegos. 
Eventually, Taylor stepped back, but Jolley leaned almost all the way
inside the truck and continued to strike Mr. Gallegos.[6]









Mr. Gallegos exited his truck through the
passenger side door and ran away.  Taylor
commented that Mr. Gallegos did not appear to be mortally wounded because he
saw Mr. Gallegos jump over a guard rail and hurry down an  embankment. 
Taylor did not notice blood on Mr. Gallegos, but the 5 a.m. darkness
limited visibility.  At that time, Taylor
did not know that Mr. Gallegos had been stabbed.

Jolley=s truck
still would not start, so Jolley got in Mr. Gallegos=s truck,
Taylor got in Jolley=s truck, and Jolley pushed his
truck with Mr. Gallegos=s truck while Taylor
steered.  Taylor called Jeff Feaster and
Kenny Gabel, who owned a nearby mechanic=s shop,
to get them to unlock the shop so that Jolley could park his truck there out of
view.  Jolley and Taylor successfully
pushed Jolley=s truck to the mechanic=s
shop.  Either right before they left the
accident scene or right after they arrived at the shop, Jolley told Taylor that
heCJolleyChad
stabbed Mr. Gallegos.  Taylor asked where
and how many times Jolley had stabbed Mr. Gallegos, and Jolley demonstrated the
locations where he had stabbed Mr. Gallegos by patting Taylor=s left
side from his knee to his armpit.  Jolley
said that he did not know how many times he stabbed Mr. Gallegos.  Jolley did not say what he had used to stab
Mr. Gallegos; Taylor assumed that Jolley had used a knife that he always
carried. 








Taylor knew that the Haltom City Police
Department patrolled the area surrounding the mechanic=s shop,
so he drove Mr. Gallegos=s truck some distance away and
drove it into a ravine.  After Taylor
disposed of Mr. Gallegos=s truck, he returned to the
shop.  By that time, Gabel had unlocked
the shop, and Gabel, Cody Clanton, Little Ronnie, and two other men were at the
shop.  According to Taylor, Jolley broke
the blade off of Jolley=s knife and threw the blade
towards some weeds outside the shop. 
Taylor noticed  blood on his
knuckles and went to wash his hands. 
When he returned, Jolley and Clanton had left the shop.  

That evening, Taylor, Jolley, and Jolley=s
girlfriend Mary were all at Feaster=s and
Gabel=s
apartment.  Ultimately it was decided
that Mr. Gallegos=s truck should be burned to
eliminate any fingerprints.  Taylor,
Jolley, and Mary went together to purchase gas and to locate Mr. Gallegos=s truck
but decided not to burn it that night because they were worried about being
seen by people outside at a nearby house. 
The next day, Jolley attempted unsuccessfully to find the truck on his
own to burn it.  He called Taylor, and
Taylor helped him locate Mr. Gallegos=s
truck.  

Taylor testified that he did not stab Mr.
Gallegos, that he had never said that he had stabbed Mr. Gallegos, that Jolley
had never accused him of stabbing Mr. Gallegos, and that he did not intend for
Mr. Gallegos to be seriously injured.

B.     Non-Accomplice Witness Testimony








On August 1, 2003, a truck driver discovered a
man lying on the side of the road near some restaurants.  The truck driver could tell that the man had
been stabbed and called 911.  Paramedics
arrived and confirmed that the man was dead. 

Robert Presney, the crime scene officer,
testified that no weapon or cell phone was found at the scene.  Detective Sarah Jane Waters testified that
after the medical investigator arrived, police were able to move the body, to
go through the man=s pockets, to locate his driver=s
license, and to identify the man as Mr. Gallegos. 








Several days later, Detective Waters received a
call that police had located Mr. Gallegos=s truck;
it had been driven into a ravine and burned. 
She obtained records of Mr. Gallegos=s cell
phone calls and noticed a 911 call made on August 1, 2003, at 5:15 a.m.  She obtained a tape of the 911 call from
Haltom City and cleaned the tape to remove static and background noise.  But she was still unable to determine the
identity of the persons other than Mr. Gallegos whose voices were on the tape,
so she decided to release the tape to the media in the hope of obtaining
additional information about Mr. Gallegos=s
death.  After the media published the
tape of Mr. Gallegos=s 911 call, tips came in
mentioning several suspects, including Jolley and Taylor.  Detective Waters spoke with several
individuals who had discussed the offense with Taylor, and the information she
gathered indicated that Jolley was the aggressor in the incident with Mr.
Gallegos.  Approximately seven months
later, police located a knife handle on the roof of a shop near Feaster=s
mechanic shop. 








Kenny Gabel testified that in 2003 he owned a
mechanic=s shop
with and shared an apartment with Jeff Feaster. 
Gabel knew Jolley through Taylor. 
Gabel said that Taylor called him at 5:24 a.m. on August 1, 2003, and
asked him to come back to the shop and to open it.  When Gabel arrived at the shop, Taylor and Jolley
were already there.  Gabel saw Jolley=s black
Nissan truck pulled up to the shop=s bay
door.  When Gabel realized that he did
not have the key to the shop, Taylor became hysterical, saying that he needed
to put Jolley=s truck in the shop and could
not leave it outside because they had been involved in an accident.  Gabel retrieved the shop key from his
apartment and came back and opened the shop. Taylor
and Jolley both started talking about the incident.  Gabel learned that Taylor initially spoke
with Mr. Gallegos after the accident and that there was an argument regarding
who was at fault.  Jolley came over and
joined in the argument.  Gabel heard
Jolley and Taylor say that they saw Mr. Gallegos lean over and that it looked
like he might be grabbing a weapon.[7]  At that point, Taylor told Jolley to Aget him.@  Taylor and Jolley reached into the pickup to
stop Mr. Gallegos; Jolley pulled his pocket knife[8]
and stabbed Mr. Gallegos a couple of times in the leg.[9]  After being stabbed, Mr. Gallegos got out of
the truck through the passenger door and ran away.  As Jolley was talking about the stabbing, he
showed Gabel some blood on his wrist and on his watch. During this
conversation, neither Taylor nor Jolley indicated that Mr. Gallegos had been
killed.  About four or five days after
the accident, Gabel learned that Mr. Gallegos had died. 








Cody Clanton, Jolley=s best
friend since first grade, testified that on July 31, 2003, he, Jolley, a friend
named Derrick Bowman, and others were partying at Brian Picken=s[10]
house.  Clanton did not realize that
Jolley had left Picken=s house until Bowman received a
call at 5:42 a.m. from Jolley.  In
response to the call, Clanton and Bowman went to Gabel and Feaster=s
mechanic shop.  When they arrived at
about 6 a.m., Clanton saw that Gabel, Jolley, and Taylor were already at the
shop.  Clanton noticed that Taylor had
blood on his arms.  Clanton also noticed
that Jolley had blood on his arms and shirt and that his Nissan truck=s front
end was mangled. 








Jolley wanted to leave and go to his grandmother=s house,
and Clanton drove him there.  During the
drive, Jolley talked to Clanton about the events from the early morning of
August 1, 2003.  Jolley told Clanton that
he had picked up Taylor from Taylor=s
girlfriend=s house and that they got on
Interstate 820 to go back to a party. 
Jolley said that when he looked down to check Taylor=s
progress in making the blunt, he had an accident with Mr. Gallegos.  Jolley said that Mr. Gallegos had Abrake-checked@ him and
that he had hit Mr. Gallegos. Jolley said that when he and Taylor got out of
his truck, Mr. Gallegos was already on the phone dialing 911.  Taylor said, A[L]et=s get
him,@ got on
top of Mr. Gallegos, pinned Mr. Gallegos, and punched him.  Jolley said that he approached Mr. Gallegos=s truck
with his own pocket knife drawn and started stabbing Mr. Gallegos.[11]  Jolley said that Mr. Gallegos fled the truck
through the passenger side door and ran across the highway.  Jolley=s truck
would not start, so Jolley used Mr. Gallegos=s truck
to push itCwith Taylor steeringCto the
shop.  Jolley said he destroyed his knife
by opening the driver=s door and grinding the blade on
the concrete.  He said that he threw the
knife handle on the top of a nearby shop. 

On the night of August 1, 2003, Clanton and
Jolley went to Taylor=s house, and Jolley asked Taylor
where he had Aditched@ Mr.
Gallegos=s
truck.  Taylor provided a description of
the truck=s location, and Clanton and
Jolley went to find it.  They could not find
the truck and stopped looking for it at approximately 1 a.m.  During the drive back to Jolley=s
grandmother=s house, Jolley tried out
different alibis on Clanton; Clanton described them as a A[cockamamie]
scheme that [Jolley] tries to put on to somebody else.@  For instance, Jolley said that Taylor was the
stabber because Jolley is left-handed and because Mr. Gallegos=s stab
wounds were on the left side. 








Jolley called Clanton on August 3, 2003.  Jolley wanted to obtain a better description
of the truck=s location from Taylor.  Jolley said that he, Mary, and Bowman had
unsuccessfully looked for the truck the previous day.  Eventually, Clanton, Jolley, and Taylor
loaded up Taylor=s motorcycle and drove to an
area near the shop; Taylor used his motorcycle to take Jolley to the
truck.  Clanton and Jolley left and
purchased some gas; afterwards, Clanton set the truck on fire.  After the truck had been burned, Jolley told
some people that the evidence was gone and said that he wanted to plant one of
his guns in the burned truck so it appeared he stabbed Mr. Gallegos in self
defense after Mr. Gallegos pulled a gun. 

Clanton said that he and Jolley separately heard
the 911 tape.  Jolley told Clanton that
he could hear Taylor=s voice on the tape saying, ALet=s get
him.@ Clanton
heard Jolley saying, AYou brake-checked me,@ and
Jolley admitted to Clanton that the voice was his.  Clanton agreed that, because of the media
coverage, he knew that Mr. Gallegos had died before he set Mr. Gallegos=s truck
on fire. 








Dr. Daniel Konzelmann, a Deputy Medical Examiner
in the Tarrant County Medical Examiner=s
Office, testified that he performed the autopsy on Mr. Gallegos.  Dr. Konzelmann noted sharp-force injuries to
Mr. Gallegos=s left chest, left abdomen or
belly, left lower arm, and left thigh and leg; he also noted some scrapes on
the face and the right knee.  Dr.
Konzelmann stated that none of the wounds to the head were life threatening;
the wound to the left upper chest was not fatal in and of itself; the wound to
the heart (described as wound number two in the report and in his testimony)
was fatal and was the most important wound; and with proper medical care, the
wound to the left lower chest (described as wound number three in the report
and in his testimony) at the costal margin might be survivable.  Overall, wound numbers two and three were the
most immediate and life threatening.  Dr.
Konzelmann said that the wounds appeared to be knifelike.  He concluded that the cause of death was
sharp-force wounds and that the manner of death was homicide.

III.  Sufficiency of the Evidence

In his first and second points, Jolley complains
that the evidence is legally and factually insufficient.  Specifically, Jolley contends that the State
failed to prove beyond a reasonable doubt that Jolley stabbed Mr. Gallegos in
the chestCthe two fatal woundsCnot just
in the leg and that Jolley intended to cause Mr. Gallegos=s death
or intentionally committed an act clearly dangerous to human life.

A.     Legal Sufficiency Standard of Review

In reviewing the legal sufficiency of the
evidence to support a conviction, we view all the evidence in the light most
favorable to the verdict in order to determine whether any rational trier of
fact could have found the essential elements of the crime beyond a reasonable
doubt.  Jackson v. Virginia, 443
U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Hampton v. State, 165 S.W.3d
691, 693 (Tex. Crim. App. 2005).








This standard gives full play to the
responsibility of the trier of fact to resolve conflicts in the testimony, to
weigh the evidence, and to draw reasonable inferences from basic facts to
ultimate facts.  Jackson, 443 U.S.
at 319, 99 S. Ct. at 2789.  The trier of
fact is the sole judge of the weight and credibility of the evidence.  See
Tex. Code Crim. Proc. Ann. art. 38.04 (Vernon 1979); Margraves v.
State, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000).  Thus, when performing a legal sufficiency
review, we may not re-evaluate the weight and credibility of the evidence and
substitute our judgment for that of the fact finder.  Dewberry v. State, 4 S.W.3d 735, 740
(Tex. Crim. App. 1999), cert. denied, 529 U.S. 1131 (2000).  We must resolve any inconsistencies in the
evidence in favor of the verdict.  Curry
v. State, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).

The sufficiency of the evidence should be
measured by the elements of the offense as defined by the hypothetically
correct jury charge for the case.  Malik
v. State, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997); Ortiz v. State,
993 S.W.2d 892, 895 (Tex. App.CFort
Worth 1999, no pet.).  Such a charge
would be one that accurately sets out the law, is authorized by the indictment,
does not unnecessarily restrict the State=s
theories of liability, and adequately describes the particular offense for
which the defendant was tried.  Gollihar
v. State, 46 S.W.3d 243, 253 (Tex. Crim. App. 2001); Malik, 953
S.W.2d at 240.  The law as authorized by
the indictment means the statutory elements of the charged offense as modified
by the charging instrument.  See Curry,
30 S.W.3d at 404.

 








B.     Factual Sufficiency Standard of Review








In reviewing the factual sufficiency of the
evidence to support a conviction, we are to view all the evidence in a neutral
light, favoring neither party.  See
Zuniga v. State, 144 S.W.3d 477, 481 (Tex. Crim. App. 2004).  The only question to be answered in a factual
sufficiency review is whether, considering the evidence in a neutral light, the
fact finder was rationally justified in finding guilt beyond a reasonable
doubt.  Id. at 484.  There are two ways evidence may be factually
insufficient:  (1) when the evidence
supporting the verdict or judgment, considered by itself, is too weak to
support the finding of guilt beyond a reasonable doubt; or (2) when there is
evidence both supporting and contradicting the verdict or judgment and,
weighing all of the evidence, the contrary evidence is so strong that guilt
cannot be proven beyond a reasonable doubt. 
Id. at 484-85.  AThis
standard acknowledges that evidence of guilt can >preponderate= in
favor of conviction but still be insufficient to prove the elements of the
crime beyond a reasonable doubt.@  Id. at 485.  In other words, evidence supporting a guilty
finding can outweigh the contrary proof but still be insufficient to prove the
elements of an offense beyond a reasonable doubt.  Id. 
 In performing a factual
sufficiency review, we are to give deference to the fact finder=s
determinations, including determinations involving the credibility and demeanor
of witnesses.  Id. at 481; Cain
v. State, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).  We may not substitute our judgment for the
fact finder=s.  Zuniga, 144 S.W.3d at 482.  

A proper factual sufficiency review requires an
examination of all the evidence.  Id.
at 484, 486-87.  An opinion addressing
factual sufficiency must include a discussion of the most important and
relevant evidence that supports the appellant=s
complaint on appeal.  Sims v. State,
99 S.W.3d 600, 603 (Tex. Crim. App. 2003).

C.     Standard for Corroborating Accomplice
Witness Testimony








The court of criminal appeals has held that the
accomplice witness rule, Texas Code of Criminal Procedure article 38.14,[12]
is a statutorily imposed sufficiency review that is not derived from federal or
state constitutional principles that define the legal and factual sufficiency
standards.  Cathey v. State, 992
S.W.2d 460, 462-63 (Tex. Crim. App. 1999), cert. denied, 528 U.S. 1082
(2000).  The accomplice witness rule is
satisfied if there is some non-accomplice evidence that tends to connect the
accused to the commission of the offense. 
Gill v. State, 873 S.W.2d 45, 48 (Tex. Crim. App. 1994) (citing Gosch
v. State, 829 S.W.2d 775, 777 (Tex. Crim. App. 1991), cert. denied,
509 U.S. 922 (1993)).  The corroborative
evidence need not directly link the accused to the crime or be sufficient in
itself to establish guilt beyond a reasonable doubt.  Id. at 48; Gosch, 829 S.W.2d at
777.  The corroborative evidence may be
circumstantial or direct.  Gosch,
829 S.W.2d at 777; Paulus v. State, 633 S.W.2d 827, 843 (Tex. Crim. App.
[Panel Op.] 1981).

Although an appellant=s
presence with the accomplice witnesses before and after the offense is
insufficient to corroborate the accomplice witness=s
testimony, it is an important circumstance to be considered.  Cox v. State, 830 S.W.2d 609, 611
(Tex. Crim. App. 1992); see, e.g., Gill, 843 S.W.2d at 49.  Motive and opportunity to commit the offense
may be evidence which connects the accused to the offense.  Cox, 830 S.W.2d at 612; Paulus,
633 S.W.2d at 846.  Moreover, ill will
toward the deceased may be a factor which may corroborate accomplice witness
testimony.  See, e.g., Rodriquez v.
State, 508 S.W.2d 80, 83 (Tex. Crim. App. 1974).








Judicial experience shows that no precise rule
exists to measure the amount of evidence required to corroborate accomplice
witness testimony.  Gill, 873
S.W.2d at 48.  Each case must be
evaluated on its own unique facts.  Id.  All facts and circumstances may be looked to
as furnishing the necessary corroboration. 
Mitchell v. State, 650 S.W.2d 801, 807 (Tex. Crim. App. 1983), cert.
denied, 464 U.S. 1073 (1984).

D.     Analysis

We begin our analysis by determining whether the
State met its burden under article 38.14 to offer non-accomplice witness
evidence tending to connect Jolley with the offense.  Under the requirements of article 38.14, we
eliminate from our analysis of the evidence the evidence offered by the
accomplice witness, here Taylor, and examine the other evidence to determine if
there is sufficient corroborating evidence tending to connect Jolley to the
commission of Mr. Gallegos=s
murder.  See Hernandez v. State,
939 S.W.2d 173, 176 (Tex. Crim. App. 1997).

Although none of the non-accomplice witnesses
testified that Jolley stabbed Mr. Gallegos in the chest area where the fatal
wound was inflicted, the record reveals that numerous non-accomplice witnesses
testified that Jolley admitted to the stabbing. 
Gabel testified that Jolley said he pulled out his own pocket knife and
stabbed Mr. Gallegos a couple of times in the leg.  Clanton, who likewise obtained his
information from Jolley, testified that Jolley stabbed Mr. Gallegos two times
in the leg with Jolley=s own pocket knife.  Clanton also testified that Jolley said that
he threw the handle of the knife on the top of the shops.








The non-accomplice witnesses also testified that they never
heard that Taylor stabbed Mr. Gallegos. 
Non-accomplice witness testimony likewise confirmed that the knife
handle found on the roof of a shop near the mechanic=s shop was similar
to the one owned by Jolley and was found in the location where Clanton
testified that Jolley had disposed of it. 
Non-accomplice witness testimony also existed that Jolley made up the
story that Mr. Gallegos was armed.

Excluding Taylor=s
testimony, as mandated by article 38.14, the remaining evidence sufficiently
corroborates Taylor=s accomplice witness testimony
and satisfies the requirements of article 38.14.  See Mitchell, 650 S.W.2d at 808
(holding that evidence independent of accomplice witnesses tended to connect
appellant with crime charged and sufficiently corroborated accomplice witness=s
testimony).  We hold that Taylor=s
accomplice witness testimony was sufficiently corroborated. 








We now analyze Jolley=s claims
that the evidence is legally and factually insufficient to establish that he
stabbed Mr. Gallegos in the chest, intended to cause Mr. Gallegos=s death,
or intentionally committed an act clearly dangerous to human life.  We consider all of the evidenceCincluding
Taylor=s
sufficiently corroborated accomplice witness testimony.  See Jackson, 443 U.S. at 319, 99 S.
Ct. at 2789; Zuniga, 144 S.W.3d at 481. 
The jury was charged that it could find Jolley guilty (1) if he
intentionally or knowingly caused Mr. Gallegos=s death
by stabbing him with a knife, (2) if he intentionally, with the intent to cause
serious bodily injury to Mr. Gallegos, stabbed him with a knife, causing Mr.
Gallegos=s death,
or (3) if, under the law of parties, he assisted Taylor to commit the
offense.  See Tex. Penal Code Ann. ''
7.01-.02, 19.02(b)(1), (2) (Vernon 2003).

Taylor=s
corroborated accomplice witness testimony is legally and factually sufficient
to establish that Jolley stabbed Mr. Gallegos in the chest with the requisite
intent.  Taylor testified, and the jury was
free to believe that, in response to Taylor's question about where Jolley
stabbed Mr. Gallegos, Jolley patted Taylor all the way up his left side from
above the knees to the armpit. 
Additionally, several of Jolley and Taylor's acquaintances testified
that Jolley admitted that he used his knife and that he stabbed Mr.
Gallegos.  The acquaintances testified
that Jolley never claimed that Taylor stabbed Mr. Gallegos.








Viewing the evidence in the light most favorable
to the verdict, we hold that a rational trier of fact could have found the
essential elements of the offense beyond a reasonable doubt.  Jackson, 443 U.S. at 319, 99 S. Ct. at
2789; Burden v. State, 55 S.W.3d 608, 612 (Tex. Crim. App. 2001).  Furthermore, viewing all the evidence in a
neutral light, favoring neither party, we conclude that evidence exists
supporting the elements necessary for the jury to find Jolley guilty of
murder.  See Tex. Penal Code Ann. ''
7.01-.02, 19.02(b)(1), (2).  Evidence
supporting the verdict, taken alone, is not too weak to support the finding of
guilt beyond a reasonable doubt, and the contrary evidence is not so strong
that guilt cannot be proven beyond a reasonable doubt.  Dotson v. State, 146 S.W.3d 285, 295
(Tex. App.CFort Worth 2004, pet. ref=d); see
also Meeks v. State, 135 S.W.3d 104, 112-13 (Tex. App.CTexarkana
2004, pet. ref=d) (finding sufficient
corroborating evidence of accomplice testimony that tends to connect appellant
to offense and holding evidence factually sufficient).  We overrule Jolley=s first
and second points.

IV.  Hearsay Evidence

In his third point, Jolley contends that the
trial court abused its discretion by admitting hearsay evidence.  Specifically, Jolley argues that the
following portions of Gabel=s
testimony were wrongly admitted into evidence as adoptive admissions:

[PROSECUTOR:]  Did that truck
ever start while you were there?

 

A.  Not during that day, no.

 

Q.  At this point is it still
just you, Bria[n] Taylor[,] and Jeromy Jolley?

 

A.  Yes.








Q.  What happened next?

 

A.  I seen the damage to the
vehicle[,] and it looked like he had hit a guard rail.  That is what I was told, you know, that
they  --

 

[DEFENSE COUNSEL:]  Objection,
hearsay.

 

Q.  [PROSECUTOR:] Who told you?

 

A.  Either Brian or Jeromy.  I don=t remember who, one of the two.

 

Q.  When you were told, were
they both together or separate?

 

A.  We were all three together.

 

. . . .

 

Q.  Okay.  Did you hear anything else?  What did you hear next?

 

A.  Well, I heard next -- it=s kind of [a] mixture of
what Brian and Jeromy had both said, so I can=t differentiate who [is]
saying the exact word.  We were all three
talking.

 

Q.  Let me ask you questions
about that.  When you say all three,
Brian and Jeromy [were] there together, telling the story at some points?

 

A.  Yes.

 

Q.  Okay.  When Brian adds in something, tells a portion
of it, is Jeromy objecting to it or correcting it or he is agreeing with it?

 

A.  Not that I remember.  He didn=t object to it.

 








[PROSECUTOR]:  Your Honor, I=m going to offer all of
this, either as an admission of party opponent or admission of party opponent
through test admission from a statement against interest -- I object it is a
hearsay exception --[13]

 

[DEFENSE COUNSEL]:  Your Honor,
may I take this witness on voir dire?

 

THE COURT:  Yes.

 

VOIR DIRE EXAMINATION

 

BY [DEFENSE COUNSEL]:

 

. . . .

 

Q.  Good.  Regarding the conversation that you are now
talking with the Prosecution about where Brian and Jeromy are speaking with you
--

 

A.  Yes.

 

Q.  -- and your testimony has
just been that Brian would say some things and that Jeromy would not object?

 

A.  Yes.

 

Q.  Was it just like Brian was
making a statement, and not that Jeromy agreed or disagreed, when you finished
. . . making that statement, then Jeromy would say whatever he needed to say?  Is that basically what happened?  Not that he was agreeing with what Brian
stated, but what Brian stated, most times people don=t talk at the same
time.  So after Brian completed his
statement, then Jeromy made a statement?








A.  No, ma=am.  At this -- this particular incident, they
were both speaking at the same time.

 

Q.  Okay.  I understand they may have been speaking at
the same time.

 

A.  Yes.

 

Q.  When we are saying Aat the same time[,]@ are you meaning [that]
you are in a group and having this conversation together?

 

A.  Yes.

 

Q.  Okay.  And what I=m talking about, just like you and I are talking
right now, and I may say, well, I came here today [and] it was raining outside,
dah, dah, dah, and you are saying, well, you came here today and it wasn=t raining outside, or you
had to park four blocks down, not really trying to dispute what I was saying,
you are just saying what you did that day.

 

Do you understand what I=m saying?

 

A.  I=m trying to follow.

 

Q.  Okay.  The conversation between Brian, yourself[,]
and Jeromy, Brian basically talked to you, say things to you, and then also
Jeromy stated things to you.  Neither one
was saying, oh, yeah, that is correct; oh, yeah, that is what happened.  Did anybody state that?

 

A.  No, ma=am.

 

Q.  Okay.  So basically you understand that there were
two individuals you were listening to; is that correct?

 

A.  Yes, ma=am.

 








Q.  And one particular
individual -- either Brian Taylor made certain statements to you, and then
another individual, Jeromy Jolley, may have made statements to you.  Do you understand that?

 

A.  Yes, ma=am.

 

Q.  And whatever Jeromy stated
to you may have been different than what Brian Taylor stated to you; is that
correct?  They didn=t both say the same
thing?

 

A.  No, ma=am.

 

[DEFENSE COUNSEL]:  Your Honor,
I=m going to have to
object.  I mean, if he cannot
differentiate between who made what statement, it=s not fair to my
client.  It=s not giving us proper
notice.  And I don=t think it is going to be
an exception to the hearsay rule.

 

THE COURT:  All right.  I=ll overrule that. 

 








We review a trial court's ruling admitting or
excluding evidence for an abuse of discretion. 
Prystash v. State, 3 S.W.3d 522, 527 (Tex. Crim. App. 1999),
cert. denied, 529 U.S. 1102 (2000); Montgomery v. State, 810 S.W.2d
372, 391 (Tex. Crim. App. 1991) (op. on reh'g). 
Appellate courts should give great discretion to the trial courts,
reversing only if the trial court acts outside Athe zone
of reasonable disagreement.@  Montgomery, 810 S.W.2d at 391.  Thus, so long as the trial court's decision
to admit or exclude evidence falls in the zone within which reasonable minds
may differ, appellate courts should refrain from disturbing the trial court's
decision on appeal.  Id.;  Karnes v. State, 127 S.W.3d 184, 189
(Tex. App.CFort Worth 2003, no pet.). 

Rule of evidence 801(e) identifies circumstances
in which certain statements are not hearsay. 
Paredes v. State, 129 S.W.3d 530, 534 (Tex. Crim. App.
2004).  A statement offered against a
party which is Aa statement of which the party
has manifested an adoption or belief in its truth@ is not
hearsay.  Tex. R. Evid. 801(e)(2)(B); Paredes, 129 S.W.3d at
534.  A party=s
silence may be sufficient to establish an adoptive admission.  See Alvarado v. State, 912 S.W.2d 199,
215 (Tex. Crim. App. 1995).








Here, the record demonstrates that Jolley and
Taylor were talking and saying the same thing. 
Gabel could not distinguish between the two, who were giving identical
accounts of the events in question. 
There is nothing to show that Jolley did not hear the statements; instead,
the record reveals that all three of the menCJolley,
Taylor, and GabelCwere together when the details
of the event were being relayed.  Some of
the statements may not have been made by both Jolley and Taylor, but Jolley did
not contradict Taylor or claim that what Taylor was saying was not true.  Because these statements fall within the
adoptive admission category of nonhearsay, the trial court did not abuse its
discretion by concluding that the statements were admissible as adoptive
admissions.  See, e.g., Paredes,
129 S.W.3d at 535-36 (holding no abuse of discretion existed admitting adoptive
admission of defendant); Martinez, 131 S.W.3d at 37 (same).  We overrule Jolley=s third
point.

V.  Conclusion

Having overruled all of Jolley=s
points, we affirm the trial court=s
judgment.

 

PER
CURIAM

 

PANEL F:    WALKER, LIVINGSTON, and DAUPHINOT, JJ.

 

DO NOT PUBLISH

Tex.
R. App. P.
47.2(b)

 

DELIVERED: January 26,
2006











[1]See Tex. R. App. P. 47.4.





[2]The issue of whether
Taylor was an accomplice in fact was submitted to the jury.  Jolley did not request that the jury be
instructed that Taylor was an accomplice as a matter of law or object to the
charge on this ground.





[3]A blunt is a cigar that
has been hollowed out and filled with marijuana.





[4]Although Jolley and
Taylor did not know the name of the other driver at this time, we use his name
for ease of reference.





[5]Taylor=s October 9, 2003 written
statement said that Aone of us@ opened the door.





[6]Taylor testified that,
during this time, although he could not see Jolley=s hands he did not see a
weapon.





[7]Although Gabel remembered
hearing Jolley say that Mr. Gallegos Alooked like he was pulling a gun out,@ he said Jolley grinned
when he said it and kind of looked at Gabel, leading Gabel to conclude that it
was not true but that Jolley intended to use it as an excuse in the event he
was caught.  However, Taylor also told
Gabel that he thought Mr. Gallegos had a weapon. 





[8]Jolley told Gabel that
Jolley had destroyed the knife on the way to the shop. 





[9]Gabel could not remember
if Jolley was the exact person who said that he had stabbed Mr. Gallegos; Gabel
heard that Jolley had stabbed Mr. Gallegos from both Taylor and Jolley.  However, Gabel never heard that Taylor had
done the stabbing. 





[10]Brian Picken is also
referred to as Brian Pippen in the record.





[11]Although Clanton
initially testified that Jolley did not state how many times he stabbed Mr.
Gallegos, Clanton=s prior written statement
recited that Jolley stabbed Mr. Gallegos two times in the leg. 





[12]The accomplice witness
rule provides that A[a] conviction cannot be
had upon the testimony of an accomplice unless corroborated by other evidence
tending to connect the defendant with the offense committed; and the
corroboration is not sufficient if it merely shows the commission of the
offense.@  Tex.
Code Crim. Proc. Ann. art. 38.14 (Vernon 2005).





[13]Although the objection
appears in the reporter=s record as set forth
above, we believe that the objection should have been attributed to defense
counsel before he took the witness on voir dire.